**IT IS FURTHER ORDERED** that defendants' motion for summary judgment [# 12] is denied.

**IT IS FURTHER ORDERED** that plaintiff's motion to strike defendant's reply to plaintiff's complaint [# 6] is denied as moot.

Leroy **CARHART**, M.D., on behalf of himself and his patients obtaining abortions, Plaintiff,

v.

Don **STENBERG**, in his official capacity as Attorney General for the State of Nebraska; Mike Munch, in his official capacity as County Attorney for Sarpy County and as a representative of all county attorneys in Nebraska; Gina Dunning, in her official capacity as Director of Regulation and Licensure of the Nebraska Department of Health and Human Services; and Charles Andrews, M.D., in his official capacity as Chief Medical Officer of Nebraska, Defendants.

No. 4:97CV3205.

United States District Court, D. Nebraska.

July 2, 1998.

**1100**

Simon Heller, David Gans, The Center for Reproductive Law & Policy, New York City, Jerry M. Hug, Alan G. Stoler, Omaha, NE, for Plaintiff.

Don Stenberg, Attorney General, Steve Grasz, Deputy Attorney General, James D. Smith, Assistant Attorney General, Lincoln, NE, for Defendants Don Stenberg, Gina Dunning, Charles Andrews.

Tamra L. Walz, Deputy Sarpy County Attorney, Papillion, NE, for Defendant Mike Munch.

## MEMORANDUM AND ORDER

KOPF, District Judge.

Because the State of Nebraska has imposed an undue burden on Dr. Carhart and his patients by adopting and threatening to enforce a vague "partial-birth" abortion law, I shall declare the law unconstitutional as applied to Dr. Carhart and his patients. I will also permanently enjoin enforcement of Nebraska's law against the doctor and his patients (and those who are similarly situated). However, I do not reach the question of whether the law is facially invalid. Pursuant to Federal Rule of Civil Procedure 52(a), my reasons for this decision are set forth below.

### I. FINDINGS OF FACT

#### A. The Parties

1. Plaintiff LeRoy Carhart, M.D., practices medicine and surgery in Nebraska and performs abortions in Bellevue, Sarpy County, Nebraska. (Filing 1, Compl., at 3; Filing 9, Stenberg and Thomas Answer, at 2; Ex. 16, Carhart *Curriculum Vitae*, at 1, 5.)

2. Carhart received his Doctorate of Medicine in 1973; completed his internship at Malcolm Grow USAF Hospital at Andrews Air Force Base, Maryland, in 1974; and completed his general surgery residency at Hahnemann Medical College and Hospital in Philadelphia, Pennsylvania, and Atlantic City Medical Center in Atlantic City, New Jersey, in 1978. Carhart is a retired lieutenant colonel in the United States Air Force who served as chief of general surgery, chief of emergency medicine, and chairman of the department of surgery at Offutt Air Force Base in Nebraska from 1978 to 1985. As part of his duties at Offutt, Carhart supervised 20 to 25 other physicians, including obstetricians and gynecologists. (Tr.[1]

---

1. "Tr." denotes the transcript from the hearing on the preliminary injunction. *See Carhart v.*

*Stenberg,* 972 F.Supp. 507 (D.Neb.1997) (granting preliminary injunction) *(Carhart I).* Pursuant

Carhart has been an assistant professor in the surgery departments of both Creighton University School of Medicine and the University of Nebraska Medical Center. (Ex. 16, Carhart *Curriculum Vitae,* at 2–4.) Since 1985 Carhart has operated a general medical practice with a specialized abortion facility.[2] (Tr. 82:14–21.) He performs 800 abortions each year. (Tr. 83:3.) Carhart has never attempted to become certified by a medical specialty board and currently has no hospital privileges. (Tr. 139:2–25.) He is licensed to practice medicine in eight states. (Ex. 16, Carhart *Curriculum Vitae,* at 5.)

3. Defendant Don Stenberg is attorney general of the State of Nebraska. Defendant Gina Dunning is director of the Nebraska Department of Health and Human Services Regulation and Licensure. (Filing 1, Compl., at 3–4; Filing 9, Stenberg Answer, at 2; Order on Final Pretrial Conf. at 2.) Defendant Mike Munch is the elected county attorney for Sarpy County, Nebraska, and is responsible for the enforcement of criminal law within Sarpy County. (Filing 1, Compl., at 3–4; Filing 11, Munch Answer, at 1.) Defendant Charles Andrews, M.D., is the Chief Medical Officer for Nebraska who has disciplinary authority over medical license holders in Nebraska, pursuant to Neb.Rev.Stat. § 81–3201 (Michie Supp.1997).

### B. Legislative Bill 23

4. On June 3, 1997, the Nebraska Unicameral passed Legislative Bill 23 ("LB 23") with an emergency clause making it effective upon the governor's signature on June 9, 1997. (Ex. 6.) On August 14, 1997, I enjoined Defendants from enforcing LB 23 against Dr. Carhart "regarding his performance of D & X abortions on nonviable fetuses." (Filing 19 at 58.)

5. Legislative Bill 23 prohibits "partial-birth abortions" in the State of Nebraska "unless such procedure is necessary to save the life of the mother whose life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself." LB 23 § 3(1), codified at Neb.Rev.Stat. § 28–328(1) (Michie 1997).

6. Legislative Bill 23 defines "partial-birth abortion" as follows:

> Partial-birth abortion means an abortion procedure in which the person performing the abortion partially delivers vaginally a living unborn child before killing the unborn child and completing the delivery. For purposes of this subdivision, the term partially delivers vaginally a living unborn child before killing the unborn child means deliberately and intentionally delivering into the vagina a living unborn child, or a substantial portion thereof, for the purpose of performing a procedure that the person performing such procedure knows will kill the unborn child and does kill the unborn child.

LB 23 § 2(9), codified at Neb.Rev.Stat. § 28–326(9) (Michie 1997).

7. Legislative Bill 23 makes the "intentional and knowing performance of an unlawful partial-birth abortion" a Class III felony, as well as grounds for automatic suspension and revocation of an attending physician's license to practice medicine in Nebraska. LB 23 § 3(2) & (4), codified at Neb.Rev.Stat. § 28–328(4) & (5) (Michie 1997).

8. "Partial-birth abortion" is not a recognized medical term. (Tr. 88:18–89:6, Carhart Test.; Tr. 216:3–13, Hodgson Test.)

### C. Abortion Procedures

9. Carhart performs abortions in a clinic setting from a gestational age of 3 weeks until fetal viability,[3] with gestational age being measured from the first day of a woman's last menstrual period, as verified by ultrasound. (Tr. 83:9–84:5; 141:20–22.) Of the

---

to Fed.R.Civ.P. 65(2), the parties agreed that the testimony and exhibits received in evidence at the hearing on the preliminary injunction were admissible at the trial on the merits as part of the trial record and need not be repeated at trial. (Order on Final Pretrial Conf., at 3.)

**2.** Carhart learned to perform abortions on rotation in a civilian hospital while on active duty with the Air Force. He was not permitted to perform abortions in Air Force hospitals. (Tr. 194:6–15 .)

**3.** Carhart testified that fetal viability may occur around 22 weeks' gestation, but it can vary depending upon maternal habits such as drug and alcohol use and lack of prenatal care. (Tr. 174:17–175:7.)

800 women on whom Carhart performed abortions in 1996, 200 were past their 14th week of pregnancy. (Tr. 83:1–3; 185:14–24.) As far as he knows, Carhart is the only abortion provider in Nebraska who performs elective abortions past 16 weeks' gestation. (Tr. 132:10–18.)

10. If a woman wants an abortion after viability and the abortion is not medically indicated, Carhart refers the patient elsewhere. (Tr. 87:13–22.) If a patient comes to him for an abortion and "there is any concern of fetal viability," Carhart does not use his own judgment to determine viability, but instead insists on a specific referral from the patient's physician identifying fetal flaws, stating that the fetus is not viable, and stating that the patient needs an abortion. (Tr. 174:4–16.)

11. Carhart performs abortions on patients whose health, rather than life, would be preserved by having an abortion, such as those with severe renal disease, severe diabetes that has required hospitalization, and hyperemesis gravidarum, a condition characterized by constant vomiting throughout pregnancy such that the pregnant woman loses a good portion of her body weight. Carhart has also performed abortions on patients who indicated that if abortion had not been an option for them, they would have considered attempting a self-induced abortion or suicide. (Tr. 133:16–134:11.)

12. Carhart selects the abortion procedure he will use on various patients based on gestational age and other medical factors. (Tr. 84:6–12.)

13. The parties have stipulated to the admission of Exhibit 7, which is a portion of the American Medical Association's (AMA's) "Report of the Board of Trustees on Late–Term Abortion." The board of trustees prepared and submitted the report to the AMA's board of delegates in May, 1997, in response to the passage of a 1996 resolution by the delegates calling for the AMA to conduct a study of late-term pregnancy termination techniques. (Filing 13 ¶ 2; Tr. 326:7–327:16.) Hereinafter, Exhibit 7 shall be referred to as the "AMA report." [4]

14. The parties have also stipulated to the admission of Exhibit 24, which is a January, 1997, statement of policy issued by the American College of Obstetricians and Gynecologists Executive Board on "intact dilatation and extraction."

### 1. Suction Curettage or Vacuum Aspiration

15. The AMA report indicates that suction curettage, or vacuum aspiration, is the most common means of inducing abortion from the 6th through the 12th week of gestation. (Ex. 7, at 7:29–30.) The AMA report describes this procedure as follows:

> Prior to the procedure a pelvic examination is done to determine the size and position of the uterus. A speculum is used to visualize the cervix, a local anesthetic such as a paracervical block is administered, and the cervix is then dilated using rigid dilators (e.g., the Pratt dilator). Osmotic dilators may be used prior to the procedure. Once the cervix is sufficiently dilated, a suction tube is inserted and rotated inside the uterus to loosen and remove the contents. The suction tube may be attached to a suction machine or syringe. A curette may be used to scrape the endometrium, thereby ensuring the removal of any remaining tissue. These procedures are typically performed on an outpatient basis.

(Ex. 7, at 7:31–37 (footnotes omitted).)

16. Carhart uses curettage [5] with vacuum aspiration from approximately the 12th through the 15th week of gestation. Carhart stated that "[a]t about the 12th or 13th week, we usually use curettage with vacuum aspiration up through the 15th, 16th week, after that 16th week, generally, it's a dilation and

---

4. Exhibit 3, a certified "rough draft transcript" of the floor debate on LB 23, and Exhibit 8, an informational booklet addressing fetal development entitled "If you are Pregnant ..." which was prepared by the Nebraska Department of Health pursuant to state law, were also received into evidence, but not to prove the truth of the matters asserted therein. (Tr. 7:23–9:25.)

5. Carhart describes curettage as a method of removing fetal debris, placental fragments, and potentially cancerous growths from the uterine wall, thereby reducing the risk of infection, greater bleeding, and passing fetal material into the mother's bloodstream. (Tr. 164:6–165:7.)

evacuation procedure." (Tr. 84:20–23.) At another point, Carhart stated that the "14th to 15th week" was the latest he would use the curettage with vacuum aspiration procedure. (Tr. 93:12–14.) While Carhart attempts to use curettage with vacuum aspiration in the 14th and 15th weeks of gestation, "[m]ost of the time by the 15th week, it doesn't work," and he must "use a mechanical forcep to actually grasp the fetus and remove it." (Tr. 93:14–17.)

17. Carhart uses ultrasound while conducting the vacuum aspiration procedure. Ultrasound is "an adaption of the sonar developed by the Navy in the 1930's to find the different densities of substances, usually in comparison with a known substance." (Tr. 93:22–25, Carhart Test.) Ultrasound is used to display a picture of fetal tissue and cartilage on a television screen. (Tr. 94:1–5, Carhart Test.)

18. When the vacuum aspiration procedure is used, a fetus can come through the suction tube, or cannula, intact or dismembered. Carhart uses cannulas ranging from 5 to 16 millimeters. (Tr. 95:10–24; 96:2–8.) If the tube becomes clogged during this procedure, Carhart must remove the tube to "de-clog" it, at which time the uterus will expel its contents into the vaginal cavity. (Tr. 155:18–20.)

19. The fetus is not dead before Carhart begins the vacuum aspiration procedure, and the entire fetus comes through the cannula alive in many instances. (Tr. 96:15–18; 97:16–17.)

## 2. Dilation and Evacuation (D & E)

20. According to the AMA report, the most common procedure for inducing abortion early in the second trimester of pregnancy, or in the 13th through 15th weeks of gestation, is dilation and evacuation, or D & E. (Ex. 7, at 8:1–10.) The AMA report describes the D & E procedure at 13 through 15 weeks' gestation as follows:

Ultrasonography is used prior to the procedure to confirm gestational age, because the underestimation of gestational age can have serious consequences during a D & E procedure. D & E is similar to vacuum aspiration except that the cervix must be dilated more widely because surgical instruments are used to remove larger pieces of tissue. Osmotic dilators [6] are usually used. Intravenous fluids and an analgesic or sedative may be administered. A local anesthetic such as a paracervical block may be administered, dilating agents, if used, are removed, and instruments are inserted through the cervix into the uterus to remove fetal and placental tissue. Because fetal tissue is friable and easily broken, the fetus may not be removed intact. The walls of the uterus are scraped with a curette to ensure that no tissue remains.[7] In pregnancies beyond 14 weeks, oxytocin is given intravenously to stimulate the uterus to contract and shrink.

(Ex. 7, at 8:10–19 (footnotes omitted).)

21. According to the AMA report, the D & E procedure is also used from 16 to 24 weeks' gestation, with the following variations:

Dilation and evacuation procedures performed in the mid- to late-second-trimester involve the preoperative use of laminaria or osmotic dilators (rather than surgical dilators) which are inserted in the endocervical canal in order to dilate the cervix. The procedure is usually performed under local anesthesia, using sedation and paracervical block. Intracervical vasopression is often used to minimize bleeding, and high dose oxytocin is administered intravenously prior to the procedure. Fetal tissue is extracted through the use of surgical instruments, followed by extraction of placental tissue and subsequent curettage. Because the fetus is larger at this stage of gestation (particularly the head), and because bones are more rigid, dismemberment or other destructive procedures are more likely to be required than at earlier

---

**6.** Carhart testified that the type of osmotic dilator he uses is seaweed that has been sterilized and medically prepared. He also referred to this osmotic dilator as laminaria. (Tr. 98:1–4; 99:1–3.) With this particular procedure, Carhart waits 12 to 72 hours before completing the abortion in order to allow for adequate dilation. (Tr. 98:6–14.)

**7.** Carhart testified he also vacuum aspirates the uterus to ensure that no tissue fragments are left on the uterine wall. (Tr. 98:15–18 .)

gestational ages to remove fetal and placental tissue. Some physicians use intrafetal potassium chloride or digoxin to induce fetal demise prior to a late D & E (after 20 weeks), to facilitate evacuation. (Ex. 7, at 8:28–38 (footnotes omitted).)

22. Carhart uses the D & E procedure "after that 16th week" of gestation, combined with prostaglandin to aid in cervical dilation and other medication to cause the uterus to contract. (Tr. 84:24–85:16.)

23. Carhart's method of mechanically removing the fetus from the uterus during D & E involves using ultrasound in order to observe the fetus and the surrounding area; using vacuum aspiration or forceps to rupture the membranes; and then grasping a portion of the fetus in order to bring it out of the uterus with long-handled forceps. (Tr. 100:1–14.) After the membranes are ruptured and the uterus begins to contract, a fetal extremity will often prolapse through the cervical os such that Carhart must dismember the extremity. He then attempts to bring the feet or skull down, dismembering the remaining arm or other extremities in the process. (Tr. 110:6–9; 118:9–12.)

24. When Carhart performs a D & E, he inserts an instrument inside the uterus, grabs a portion of the fetus, pulls it through the cervical os, and dismembers various fetal parts by the traction created between the instrument and the cervical os. (Tr. 116:2–10.) The tearing of fetal parts from the fetal body is accomplished by means of traction at the cervical os.[8] Dr. Carhart described the procedure in response to counsel's questions as follows:

Q When you are doing a D & E that involves dismemberment, where does the dismemberment occur; in other words, do you insert instruments into the uterus and dismember the fetus inside the uterus, or do you dismember it in some other way?

A Well, we insert one instrument inside the uterus, grab a portion of the fetus and pull it through the cervical os. The dismemberment occurs between the traction of ... my instrument and the counter-traction of the internal os of the cervix. I suppose you could put two instruments in the uterus and try to dismember it. I think that would be very dangerous.

Q So the dismemberment occurs after you pulled a part of the fetus through the cervix, is that correct?

A Exactly. Because you're using—The cervix has two strictures or two rings, the internal os and the external os, and you have—that's what's actually doing the dismembering. It's like who is pulling the cat's tail. If you are holding it and the cat's pulling it, something has to pull the other way. Otherwise, if you drag a string across the floor, you'll just keep dragging it. It's not until something grabs the other end that you are going to develop traction.

Q When we talked before or talked before about a D & E, that is not—where there is not intention to do it intact, do you, in that situation, dismember the fetus in utero first, then remove portions?

A I don't think so. . . . I don't know of any way that one could go in and intentionally dismember the fetus in the uterus. If you grab an extremity and twist it, you can watch the whole fetus just twist. It takes something that restricts the motion of the fetus against what you're doing before you're going to get dismemberment.

Q When you pull out a piece of the fetus, let's say, an arm or a leg and remove that, at the time just prior to removal of the portion of the fetus, is the fetus alive?

A Very often, yes, sir.

(Tr. 116:2–117:13.)

25. Carhart's description of this procedure is consistent with that of Dr. Jane Hodgson, founding fellow of the American College of Obstetrics and Gynecology, past

8. The cervical os is the mouth or opening of the cervical canal. STEDMAN'S MEDICAL DICTIONARY 996 (4th unabridged law. ed.1976).

president of the Minnesota Ob/Gyn Society, and author of 50 to 100 published articles on abortion. (Tr. 196:16–24; 197:11–13; Ex. 14, Hodgson *Curriculum Vitae*, at 2.) [9]

26. Through the 19th week of gestation, ultrasound confirms, by indicating a fetal heartbeat, that the fetus is "invariably" alive when Carhart performs a D & E, and via ultrasound Carhart has observed fetal heart activity with "extensive parts of the fetus removed." (Tr. 100:15–22; 109:4–23; 110:12–14; 119:2–9; 195:9–11.) Dr. Hodgson also testified that the fetus may still have a heartbeat while extremities are being removed. (Tr. 211:4–7.)

### 3. Intact Dilation and Evacuation (Intact D & E or D & X)

#### a. The Procedure

27. In an effort to minimize perforation of the uterus or cervix by instruments used during a D & E or from piercing caused by fetal parts, some physicians use "a form of D & E that has been referred to in the popular press as intact dilation and extraction (D & X)." (Ex. 7, at 8:40–42.)

28. For any abortion "over 15 weeks[']" gestation, Carhart intends and prefers to remove the fetus intact by using the intact D & E procedure, although it is "usually the

19th- and 18th- and early 20–week fetuses that come out intact." (Tr. 100:9–10; 101:3–5; 184:1–23.)

29. Citing the American College of Obstetricians and Gynecologists' (ACOG) January, 1997, statement on intact dilation and extraction, the AMA report describes the intact D & X as "deliberate dilation of the cervix, usually over a sequence of days; instrumental conversion of the fetus to a footling breech; breech extraction of the body excepting the head; and partial evacuation of the intracranial contents of a living fetus to effect vaginal delivery of a dead but otherwise intact fetus." (Ex. 7, at 8:42–46; Ex. 24.) [10]

30. In contrast to the AMA's and ACOG's description of the intact D & E or D & X procedure, Carhart does not perform instrumental conversion of the fetus to a footling breech, but removes the fetus headfirst or feet first, depending on how the fetus is positioned. (Tr. 102:19–24; 111:3–6; 156:18–157:19.) Carhart prefers the feet-first presentation because less dilation is required and "that's the absolute safest scenario." (Tr. 192:18–193:2.)

31. When Carhart performs this procedure, he drains the amniotic fluid before

9. Dr. Hodgson received her M.D. and M.S. in obstetrics and gynecology from the University of Minnesota School of Medicine; completed her internship and residency at the Jersey City Medical Center in New Jersey; and completed a fellowship in obstetrics and gynecology at the Mayo Clinic in Rochester, Minnesota. (Ex. 14, Hodgson *Curriculum Vitae*, at 2.) Dr. Hodgson has performed or supervised at least 30,000 abortions as the director of numerous medical clinics throughout the country since 1973, and has delivered at least 5,000 babies. (Tr. 197:14–20.) Dr. Hodgson has been a board member of Planned Parenthood, belongs to the National Abortion Federation and the Abortion Rights Council, and is currently a board member for the Center For Reproductive Law & Policy, for whom Plaintiff's lawyers also work. (Ex. 14, Hodgson *Curriculum Vitae*, at 3.)

10. The ACOG statement of policy on intact dilatation and extraction states that "unless all four elements [dilatation of cervix, instrumental conversion of fetus to footling breach, breech extraction of body excepting head, and partial evacuation of intracranial contents of living fetus to effect vaginal delivery of dead, but otherwise intact, fetus] are present in sequence, the proce-

dure is not an intact D & X." (Ex. 24.) The policy statement states that the intact D & X is one method of terminating a pregnancy after 16 weeks' gestation, and concludes that:

Terminating a pregnancy is performed in some circumstances to save the life or preserve the health of the mother. Intact D & X is one of the methods available in some of these situations. A select panel convened by ACOG could identify no circumstances under which this procedure, as defined above, would be the only option to save the life or preserve the health of the woman. An intact D & X, however, may be the best or most appropriate procedure in a particular circumstance to save the life or preserve the health of a woman, and only the doctor, in consultation with the patient, based upon the woman's particular circumstances can make this decision. The potential exists that legislation prohibiting specific medical practices, such as intact D & X, may outlaw techniques that are critical to the lives and health of American women. **The intervention of legislative bodies into medical decision making is inappropriate, ill advised, and dangerous.**

(Ex. 24 (bold in original).)

beginning the evacuation procedure in order to avoid amniotic fluid embolus, which he views as a serious and common cause of maternal death or complications. (Tr. 102:1–6.) If possible, Carhart then attempts to grasp and divide the umbilical cord of the fetus, which is the structure that transports arterial and venous blood between the fetus and the placenta, giving the fetus its only source of oxygen. If he divides the cord, the fetus will usually die within 6 to 10 minutes. (Tr. 111:11–20; 189:20–24.) There are instances in which Carhart cannot divide the cord because he is unable to reach it due to fetal position or spontaneous protrusion of a fetal part through the cervical os, preventing access to the cord. (Tr. 111:21–25; 190:17–25.)

32. If Carhart succeeds in dividing the umbilical cord, he does not wait for fetal death to occur before continuing the procedure because once the membranes have been ruptured and drugs administered to induce contractions, each minute of delay causes maternal blood loss. (Tr. 190:2–16.)

33. When the fetus is presented feet first, Carhart, using forceps, pulls the feet of the living fetus from the uterus into the vaginal cavity and then pulls the remainder of the fetus, except the head, into the vaginal cavity to a point where the base of the fetal skull is lodged in the uterine side of the cervical canal. (Tr. 110:19–22; 112:2–12.) At that point, the size of the head will not permit him to pull it through the cervical canal into the vaginal cavity. To decompress the fetal skull and evacuate the contents in order to pull it through the cervical canal, Carhart uses an instrument to either tear or perforate the skull to allow insertion of a cannula and removal of the cranial contents. Sometimes he will crush the skull rather than pierce it in order to reduce the size of the skull. (Tr. 104:2–6; 112:13–16.) Brain death occurs sometime during this two- to three-second reduction procedure, but fetal heart function may continue for several seconds or minutes after the fetus's skull is decompressed. (Tr. 112:17–113:7.)

34. While he intends to remove the fetus intact for any abortion performed past 15 weeks' gestation, only about 5 or 10 percent of the fetuses Carhart aborts are delivered totally intact due to softness of the fetal tissue such that it is easily fragmented. Carhart normally cannot perform this procedure before the 16th week of gestation because the fetal body parts tear apart during the process. (Tr. 115:9–18; 184:10–19.)

35. Some patients have requested that Carhart perform an intact D & E for personal reasons, and some physicians have asked to have the fetus as intact as possible for genetic study when the entirety of fetal deformities is unknown. (Tr. 123:9–25.)

### b. Fetal Death

36. After the 20th week of gestation, Carhart attempts to induce fetal death 48 to 72 hours before beginning the abortion procedure with an ultrasound-guided intracardiac fetal injection of digoxin and lidocaine, both of which reduce and stop cardiac activity. (Tr. 119:10–25.) Carhart attempts to inject the drugs through the mid-line of the maternal abdomen where there are fewer blood vessels and he is less likely to encounter colon or small bowel contents. (Tr. 186:14–23.) Carhart attempts to inject the fetal thoracic cavity or heart, whereupon fetal death will occur within 15 to 20 minutes, but sometimes is able to inject only the amniotic sac, causing fetal death approximately 24 hours later. (Tr. 187:1–6.)

37. Carhart attempts to induce fetal death in this manner to achieve softness and compression of the fetal tissue and skull and to provide mental comfort to his patients. (Tr. 120:2–19.)

38. Carhart does not attempt to induce fetal demise in this manner during the 16- to 20–week time frame because the waiting time between the injection and performance of the procedure is only 12 to 24 hours, and not much fetal tissue change occurs; Carhart finds that many of his patients in the earlier stages of pregnancy are more apprehensive of the fetal injection; and in the earlier stages of pregnancy, the uterus is smaller and the risks of the needle penetrating the bowel and of missing the fetus and injecting the medication into maternal circulation are greater. (Tr. 120:20–122:3; 188:2–11.) Furthermore, Carhart sees patients for whom digoxin and lidocaine are medically contraindicated during any part of their pregnancy,

such as those who have seizure disorders,[11] heart disease, or who are already taking either medication such that an injection would exceed the maximum recommended dosage. (Tr. 122:20–123:4.)

39. Dr. Hodgson testified that in all forms of abortion, the point at which fetal demise occurs is "extremely variable." (Tr. 217:17–18.) In her opinion, lack of fetal heartbeat is the best available measure for determining fetal demise, and fetal death by that measurement can be quite protracted. (Tr. 219:16–25.)

### c. Benefits of the Intact D & E or D & X

40. The AMA report states that "[t]his procedure may minimize trauma to the woman's uterus, cervix, and other vital organs. Intact D & X may be preferred by some physicians, particularly when the fetus has been diagnosed with hydrocephaly or other anomalies incompatible with life outside the womb." (Ex. 7, at 8:46–49.)

41. Carhart's intent to remove the fetus intact for any abortion performed past 15 weeks' gestation is aimed at reducing the chances of maternal complications or death. (Tr. 100:9–10; 101:7–102:6; 124:16–125:2.) Intact removal of the fetus lowers maternal complications by preventing sharp fragments, such as pieces of long bone or skull fragments, from passing through the cervical os without some kind of covering or protection. When the fetus is removed intact, its bones are covered by fetal tissue, causing less trauma to the cervix. (Tr. 101:3–16; 131:1–7.)

42. Carhart also stated that intact removal of the fetus minimizes the risk of damage to maternal structures from repeated use of instrumentation in the uterine cavity. (Tr. 107:18–108:13; 131:1–23.) The more times Carhart must enter the uterus with an instrument, the more the complication rate multiplies. (Tr. 179:13–22.) The intact D & E or D & X procedure involves fewer insertions of forceps or other foreign objects into the uterus than a D & E resulting in dis-

memberment of the fetus. (Tr. 179:23–180:2.)

43. Performing the intact D & E or D & X procedure also allows a more accurate assessment of whether the uterine cavity has been emptied. Fetal and placental debris remaining in the uterus—as is possible with a D & E involving dismemberment—can cause infection, greater bleeding, and risk of absorption of the fetal tissue into the maternal bloodstream, as explained in more detail below. (Tr. 165:4–10; 183:4–24.)

44. Dr. Hodgson described leaving fetal parts in the uterus as a potentially "horrible complication" that can cause infection and often results in perforation of the uterine wall by bony splinters. (Tr. 211:19–24.)

45. Carhart's method of intact removal of the fetus and evacuation of the contents of the fetus's brain when it is reachable through the cervical os directly outside the uterus also helps prevent "disseminated intravascular coagulopathy" (DIC), that is, the absorption into the mother's bloodstream of fetal brain, skin, and blood tissue through the blood sinuses or cavities in the uterine wall, thereby causing the mother's own coagulation factors to stop working. According to Carhart, DIC is another cause of maternal death or complications, with the risk of such a complication being less than 1 in 1,000. (Tr. 101:16–25; 102:7–14; 158:13–159:14.) Compression of the fetal skull also enables Carhart to obtain as little cervical dilation as possible in order to reduce other maternal complications, such as incompetent cervix, at a later date. (Tr. 103:2–17.)

46. In Carhart's opinion, performing an intact D & E is much safer than performing a D & E that does not result in removal of an intact fetus. (Tr. 108:14–18.) Although she has not intentionally [12] performed an intact D & E, Dr. Hodgson believes the procedure is a technological advance that has received favorable reports from those who are performing the procedure. (Tr. 212:8–22.) Dr. Hodgson believes the D & X procedure is "an

---

11. Carhart testified that lidocaine can induce seizures in people, so treating someone who has a seizure disorder with a medication that could trigger further seizures would be an "additional risk." (Tr. 170:16–171:1.)

12. Dr. Hodgson described it as a "victory" when an intact fetus is removed during a D & E without the intent to do so. (Tr. 211:8–12.)

advance in technology" because by removing the fetus intact there is "less instrument manipulation," which means, "of course, the higher your safety." (Tr. 212:4–22.)

### d. Number of Intact D & Es or D & Xs Performed by Carhart in Which Fetal Life Could Not be Terminated Before Delivery

47. In 1996, Carhart had 180 to 190 patients with a live fetus in utero for whom it was medically inadvisable to inject digoxin and lidocaine to terminate the life of the fetus and on whom he began what he intended to be an intact D & E. (Tr. 189:1–12.) Of those 180 or 190 patients, Carhart removed approximately 20 fetuses intact, and 10 of those 20 presented themselves feet first. (Tr. 191:10–22.)

### 4. The Haskell D & X

48. In *Women's Medical Professional Corp. v. Voinovich*, 911 F.Supp. 1051 (S.D.Ohio 1995) (*WMPC I* ), aff'd, 130 F.3d 187 (6th Cir.1997) (*WMPC II* ), cert. denied, —— U.S. ——, 118 S.Ct. 1347, 140 L.Ed.2d 496 (1998), the court considered the constitutionality of an Ohio law banning the use of the so-called "Dilation and Extraction" (D & X) procedure.[13] One of the plaintiffs, Dr. Martin Haskell, used a method of abortion from 20 to 24 weeks' gestation characterized by various parties in this case as the D & X procedure [14] and performed as follows:

> On the first and second days of the procedure, Dr. Haskell inserts dilators into the patient's cervix. On the third day, the dilators are removed and the patient's membranes are ruptured. Then, with the guidance of ultrasound, Haskell inserts forceps into the uterus, grasps a lower extremity, and pulls it into the vagina. With his fingers, Haskell then delivers the other lower extremity, the torso, shoulders, and the upper extremities. The skull, which is

too big to be delivered, lodges in the internal cervical os. Haskell uses his fingers to push the anterior cervical lip out of the way, then presses a pair of scissors against the base of the fetal skull. He then forces the scissors into the base of the skull, spreads them to enlarge the opening, removes the scissors, inserts a suction catheter, and evacuates the skull contents. With the head decompressed, he then removes the fetus completely from the patient.

*Id.* at 1066 (footnotes omitted). Dr. Haskell routinely cuts the umbilical cord before penetrating the skull with scissors. *Id.* at 1066 n. 17.

### 5. Labor Induction

49. Labor induction, an alternative to D & E and what has been described above as the intact D & E or D & X, may also be used to induce abortion during the 16th to 24th week of gestation. Labor may be induced by use of hypertonic solutions such as urea or saline, or prostaglandin. (Ex. 7, at 9:1–4.)

50. The use of saline to induce labor requires insertion of a needle through the abdomen and injection of the amniotic sac with a concentrated salt solution, which causes fetal demise and induces uterine contractions. Over a period of several hours, the uterine contractions cause dilation of the cervix and expulsion of the contents of the uterus. (Ex. 7, at 9:5–8.)

51. Urea is a nitrogen-based solution that causes fetal demise when injected into the amniotic sac and is typically followed by administration of prostaglandin to induce uterine contractions which will expel the contents of the uterus. (Ex. 7, at 9:8–12.)

52. Carhart does not perform saline or prostaglandin induction, and he does not perform inductions at all during the second tri-

---

**13.** The citation and the description of Haskell's procedure are offered as an explanation since various witnesses spoke about Dr. Haskell's procedure during the trial of this case. The court has not used these decisions or the evidence presented in *WMPC I* to satisfy the plaintiff's burden of proof.

**14.** A variant of the procedure was also used extensively by Dr. James McMahon before his

death in 1995. *See Partial Birth Abortion Ban, 1995: Hearings on H.R. 1833 Before Senate Judiciary Committee,* 104th Cong. 1st Sess., *available in* Westlaw 1995 WL 685998 (F.D.C.H.) (database USTESTIMONY) (statement of Dr. Mary Campbell) (Nov. 17, 1995) (describing her observations of the procedure used by Dr. McMahon). *See also* n. 13, *supra.*

mester of pregnancy because he believes induction is medically contraindicated as a method of abortion. (Tr. 86:2–7; 125:3–126:1; 126:18–19.) Carhart believes induction during the second trimester is too uncontrolled—that is, the procedure can take over a week to complete; women have reactions to the drugs used during the procedure; and a segment of the population cannot undergo induction because of medical conditions such as hypertension, heart disease, or diabetes. (Tr. 125:6–126:1.) Carhart is aware of other physicians in Nebraska who perform abortions by induction, but only for maternally or fetally indicated abortions. (Tr. 126:2–4; 132:1–9.)

53. According to Stanley K. Henshaw, deputy director of research·at the Alan Guttmacher Institute (AGI) in New York, statistical studies with which he is familiar indicate that abortions by induction are performed primarily in a hospital setting.[15] (Tr. 74:20–25; 76:20–22.) The Centers for Disease Control and Prevention (CDC) recognizes the accuracy of the data AGI collects. (Tr. 46:8–21 .)

#### 6. Hysterotomy and Hysterectomy

54. Other abortion procedures available, but not routinely used, during 16 to 24 weeks' gestation are hysterectomy and hysterotomy. According to the AMA report, "maternal mortality and morbidity associated with these procedures are significantly greater than those associated with other procedures used to induce abortion." (Ex. 7, at 9:14–16.)

55. Hysterotomy is major surgery and must be performed in a hospital setting. General anesthesia or anesthesia administered by epidural or spinal injection is necessary. The procedure consists of surgical delivery of the fetus through an incision in the abdomen and uterine wall, after which the fetus is removed, the umbilical cord cut, and the placenta removed. (Ex. 7, at 9:16–20.)

56. Hysterectomy "is appropriate in cases in which there is a preexisting pathology, such as large leiomyomas or carcinoma in situ of the cervix." (Ex. 7, at 9:20–22.)

57. Carhart does not perform hysterotomy or hysterectomy as methods of abortion, but he is aware of other physicians in Nebraska who perform abortions by these methods when an abortion is maternally or fetally indicated. (Tr. 86:2–9;   127:17–23; 132:1–9.)

#### D. Dr. Stubblefield

58. Dr. Phillip Stubblefield testified on behalf of the plaintiff regarding his experience teaching and performing abortions, the various available methods of abortion, and the risks involved with these abortion methods. (Tr.2d [16] 6:20–91:17.) Dr. Stubblefield is currently a professor and Chairman of the Department of Obstetrics and Gynecology at the Boston University School of Medicine, as well as Chief of Obstetrics and Gynecology at the Boston Medical Center. He received his B.A. from Harvard College in 1962 and his M.D. from Harvard Medical School in 1966. Dr. Stubblefield was an intern in surgery at the University of Michigan Hospital from 1966 to 1967, and a resident in obstetrics and gynecology at the Boston Hospital for Women from 1970 to 1973. He was certified by the American Board of Obstetrics and Gynecology in 1975 and has held numerous academic appointments from 1971 to the present. Dr. Stubblefield has published extensively in the areas of voluntary control of human fertility and the prevention of premature birth, has served on five editorial boards for medical journals, and has held a myriad of positions in professional societies.[17] (Ex. 29, Stubblefield *Curriculum Vitae.*)

15. Dr. Henshaw received his Ph.D. in sociology from Columbia University and his A.B. in physics from Harvard. The Alan Guttmacher Institute is a nonprofit corporation for research and public education on issues relating to reproductive health services. (Ex. 15, Henshaw *Curriculum Vitae,* at 1; Tr. 44:15–25.) Dr. Henshaw has written approximately 40 to 50 articles on studies he has conducted related to abortion, and his studies have included secondary analysis of existing data. (Tr. 45:9–17.) Dr. Henshaw has been a member of the National Abortion Federation. (Ex. 15, Henshaw *Curriculum Vitae,* at 2.)

16. "Tr.2d" denotes the transcript from the trial on the merits.

17. These professional societies include the National Abortion Federation, The Planned Parenthood Association of America, and the American College of Obstetricians and Gynecologists.

59. Since 1973 Dr. Stubblefield has performed, taught, and supervised abortions on a regular basis, including vacuum curettage, D & E, and labor induction. (Tr.2d 10:11–11:11; 13:7–20.) In his current position, he performs, supervises, or assists in 10 to 20 abortions per month. (Tr.2d 65:2–20.) When Dr. Stubblefield served as the Chief of Obstetrics and Gynecology at the Maine Medical Center from 1988 to 1994, he primarily practiced and taught the D & E procedure through 22 1/2 weeks of gestation. (Tr.2d 13:21–14:9.)

60. With regard to the various abortion procedures discussed in section (C) of this memorandum, Dr. Stubblefield testified that:

a. *Suction Curettage or Vacuum Aspiration:* The suction tube (cannula) used to vacuum the pregnancy tissue from the uterine cavity is approximately 10 inches long and extends from within the woman's uterus to outside the woman's body. The fetus generally comes out of the uterus in fragments, but "it can come out intact," as when the physician overestimates the size of the uterus and uses a larger cannula than is necessary. (Tr.2d 19:11–20:21.) At the beginning of this procedure, the fetus is living, so fragments of a fetus, such as a leg or head, "can … come out while the fetus is still living," and the fetal heartbeat can continue after a portion of the fetus has been removed. (Tr.2d 20:22–21:19; 23:8–11.) If an intact fetus comes through the cannula, the fetus can remain living outside the woman's uterus for a short time. (Tr.2d 21:11–22:5.) While Dr. Stubblefield is not aware of an "agreed upon" definition of a "living" fetus where pregnancy termination is concerned, a beating heart is something that can be "objectively attest[ed] to" such that when

"[w]e have an intact fetus with a heart beating, then the fetus is clearly alive." (Tr.2d 22:16–23:4; 68:10–23.) "[W]here we have an abortion in process … no one, to my knowledge, has tried to formally address what is living or not living in that context." (Tr.2d 69:2–5.)

b. *Dilation and Evacuation (D & E):* Due to the risk of uterine tearing and perforation, dismembering a fetus in utero is "not done ." Instead, fetal pieces are removed from the uterus at the time they are detached from the rest of the fetus. (Tr.2d 30:7–31:11.) As with the suction curettage method, the fetus is living at the beginning of the D & E procedure; legs and arms can be removed from the fetus and uterus while the rest of the fetus remains in the uterus; and the remainder of the fetus left in the uterus could be "alive" for some amount of time. (Tr.2d 31:12–32:4.) It would be possible to perform the entire D & E procedure during ultrasound monitoring so that fetal heartbeat could be detected. (Tr.2d 23:12–21; 32:2–4.) The risks of performing a D & E are trauma to the uterus and cervix, such as laceration [18] and tearing caused by dilation or "pushing an instrument through … the wall of the uterus," resulting in injury to the bowel, bladder, or other nearby organs; extensive blood loss in situations where the uterus "does not contract well"; and "rare, very serious complications" like amniotic fluid embolism [19], disseminated intravascular coagulopathy [20], and infection caused by retained pregnancy tissue. (Tr.2d 32:5–33:20.)

c. *Intact Dilation and Evacuation (Intact D & E or D & X):* Physicians who perform surgical abortions after 20 weeks

18. According to Dr. Stubblefield, "Because the uterus is large and soft, it takes some skill to avoid perforation. . . . [I]f one perforates, one can cause extensive harm. One can badly injure the bowel or bladder or the nearby organs, cause major blood loss and clearly major injury that will have to be surgically repaired with a major surgical procedure." (Tr.2d 32:12–17.)

19. Dr. Stubblefield described amniotic fluid embolism as a complication that occurs in one in 10,000 cases and is "usually fatal, where tissue from the fetus enters the mother's circulation through the big venous openings inside the uter-

us and travel[s] through her body to the lungs where they cause major troubles." (Tr.2d 32:23–33:4.)

20. Dr. Stubblefield described disseminated intravascular coagulopathy as a complication "where tissue from the fetus, smaller amounts, perhaps, enter the circulation of the mother, trigger clotting within her blood system that uses up the clotting factors, exhausts their supply, so that the patient then begins to bleed heavily and will require a treatment of blood products in order to replenish the clotting factors and stop the bleeding." (Tr.2d 32:18–33:12.)

of gestation modify the D & E procedure "to make it easier to perform and safer for the pregnant woman" since at this gestational age the fetus is larger and more rigid because "[t]he bones are now ossified and are no longer soft cartilage." (Tr.2d 34:17–24.)

(i) One modification of the D & E is the intact D & E, which involves administering successive sets of laminaria dilators and medication that causes the uterus to contract.

> Then depending on how the fetus presents, either through procedures as performed, if the fetus is presenting head first, which is probably more often the case, one can insert an instrument into the fetal skull and allow the brain content to come out. The head then collapses, and one then can pull the whole fetus out of the uterus immediately, and then reach up and pull the placenta out, and the procedure is done very quickly with very little blood loss, very little risk to the mother of perforation.

(Tr.2d 35:1–23.) Dr. Stubblefield has used the intact D & E procedure with head compression in a case where the fetus was already dead before the procedure began. (Tr.2d 39:19–40:1.) Dr. Stubblefield described the case in which he used this procedure:

> This was a patient referred to us who had a rare, awful complication of an amniocentesis done for genetic indications. We had an amniocentesis done outside of our center to diagnose Downs Syndrome for which she was at risk because of advanced age, and in retrospect, we know that the needle went through the intestine of the mother. The patient presented to another hospital about 48 hours after the amniocentesis in advanced infection, very severe infection with a lung disease and kidney disease resulting. She was transferred to our facility, and we were faced with the difficult situation of trying to stabilize this woman with advanced sepsis and then evacuate the uterus which was the source of the infection, and this is the case where I personally did a variation of intact D & E. We, in the intensive care unit, started intravenous Oxytocin to make the uterus contract, put several laminaria tents into the cervix to cause it to dilate, and then about five hours later moved her to the operating room, removed the laminaria, and I was relieved to see the cervix had dilated quite a bit, and the fetal head was presenting. I was able to just put an instrument called a t[e]naculum which is the sharp end on the fetal head, piercing it, and the brain tissue came out, and the fetus then came out and the placenta came out.

> The fetus had died a little bit before that. The mother got somewhat better after our procedure but was still seriously ill the next day, and we determined that her only chance of survival lay in us removing the uterus, so we did extract it the following day. Indeed, there was an abscess, a collection of pus within the wall of the uterus where the needle had entered the uterus, and it had gone through the bowel. The woman did survive. She was in intensive care . . . for six weeks but did survive, so certainly, her fertility was at risk, and she lost it.

(Tr.2d 44:13–46:6.)

This method of the intact D & E procedure—a "recent development"—involves less use of instruments than the "standard D & E involving fragmentation." (Tr.2d 40:2–23.) "It makes sense to think that doing the [intact D & E] would make it easier to evacuate the uterus without as many insertions of the instruments, and that . . ., theoretically, would be safer. It would be a while before we have the data to compare to say how important that really is, but [the success rate of this procedure, as reported in presentations by physicians who perform the procedure, demonstrate] a very impressive record for a late abortion procedure." (Tr.2d 40:23–41:6.) "If there are less manipulations within the uterus, less fetal tissue within the uterus less, specifically brain tissue within the uterus that enter the mother's circulation, [there is] less risk of" the "rare but devastating complications of the blood clotting abnormality, the DIC and the still less common amniotic fluid embolism." (Tr.2d 61:13–62:4.) Dr. Stubblefield noted that the risk of

leaving pregnancy tissue in the uterus is possible during the intact D & E procedure because a portion of the placenta could be left behind, but he has no reason to believe that the intact D & E procedure is less safe than the standard D & E procedure or labor induction at equal gestational ages. (Tr.2d 41:7–42:12; 62:13–23.) In fact, at advanced gestational ages, the intact D & E poses less risk of lacerating the cervix with skull or long bone pieces than does the standard D & E, which involves piece-by-piece removal of the fetus.

Dr. Stubblefield stated that "the surgeon ... whose goal is to perform an intact D & E often finds that he cannot, that the anatomy is just such that he cannot do it without avulsing pieces of the fetus." (Tr.2d 39:15–18.)

(ii) The alternative modification to the D & E "is the one which, in the lay press, has been called a partial-birth abortion." (Tr.2d 35:24–25.) Dr. Stubblefield described this procedure as follows:

> [T]he fetus is either presenting by the breech, that is, feet first or one converts it to a breech by reaching up with fingers or instruments, locating the feet, pulling them down, then pulls feet down, arms down, and then with traction so that the head is now just above the cervical opening, inserts an instrument, scissors into the skull, and lets the brain tissue come out or aspirates it with a cannula, and the head collapses, and the fetus is delivered. This is a technique that's evolved fairly recently.

(Tr.2d 35:25–36:9.) While it is always possible to injure "anybody doing fairly simple things," Dr. Stubblefield believes this procedure, as it has been described to him, allows the operator to view the base of the fetal skull at the upper end of the cervical canal such that "[i]t's possible with direct vision to slide the instrument up between the operator's fingers to enter the fetal head." (Tr.2d 43:2–10.) Thus, this procedure is not "particularly risky to the maternal health." (Tr.2d 90:6–91:2; Ct.'s Ex. 1.) Dr. Stubblefield has not performed this procedure himself, nor has he viewed anyone else perform it. (Tr.2d 91:11–15.)

Dr. Stubblefield agrees with the January, 1997, statement of policy issued by the American College of Obstetricians and Gynecologists Executive Board on "intact dilatation and extraction" (Ex. 24), which states that the intact D & X "may be the best or most appropriate procedure" in some cases. (Tr.2d 49:1–6.) As far as safety of the D & X procedure is concerned, Dr. Stubblefield is not aware of any medical studies which compare the safety of the intact D & X to other abortion procedures or conclude that the D & X procedure is safer than other abortion procedures. (Tr.2d 75:11–14; 77:22–25.) In "every area of practice," it is not appropriate to do such safety comparisons until a surgical procedure has been perfected "to the point where it's useful." (Tr.2d 75:18–76:1.) Further, the medical acceptance of surgical procedures is not always achieved by orderly and controlled testing; for instance, "[o]pen heart surgery was not tested in a randomized, controlled way. People figured out how to do it. Patients lived, they kept doing it, got better at it." (Tr.2d 78:10–20.)

Dr. Stubblefield has added a description of the D & X procedure to a chapter he regularly writes and revises for *Dr. Nichols's Textbook of Gynecologic Surgery,* and he plans to teach the procedure at the teaching hospital with which he is currently affiliated. (Tr.2d 74:6–11; 80:11–81:12.)

(iii) Dr. Stubblefield became aware of the above-described D & E variations in 1995 at a presentation by Dr. McMahon at a National Abortion Federation meeting. He also became familiar with these methods through a similar presentation by Dr. Haskell. (Tr.2d 70:7–25.) Dr. Stubblefield views these techniques as safe methods of abortion and he plans to use both methods himself. (Tr.2d 44:3–10.) He testified that head compression, as used in the intact D & E and D & X methods, is necessary because the fetal head is much larger than the cervix, which is only minimally dilated in order to lessen the risk of infection and bleeding. (Tr.2d 63:2–22.)

d. *Labor Induction:* The other procedure available "later in pregnancy" that does not involve the use of instruments inside

the uterus is labor induction. The modern method of inducing labor is to administer prostaglandins intramuscularly or directly into the vagina, where they are absorbed into the system, causing labor to begin. With use of prostaglandins, the average abortion takes 15 to 16 hours, with some women aborting more quickly and others taking "much longer." The labor-induction process is a hospital procedure that involves "[s]trong uterine contractions, labor pains" for the woman seeking the abortion. (Tr.2d 37:14–38:17.) Labor-induction procedures are not always successful, and in such cases, a D & E is then characteristically performed after the failed labor induction. (Tr.2d 43:11–44:2.)

If a woman seeking an abortion has a fetus with severe hydrocephalus, or water on the brain, the fetus' head will be "tremendously distended and swollen," so labor induction will not work. "The woman is not going to be able to expel that fetus until the fetus dies and the head begins to be depressed unless you decompress the head yourself." (Tr.2d 52:2–13.) Further, use of prostaglandins to induce labor is contraindicated in women with severe heart disease. (Tr.2d 52:14–24.)

e. *Hysterotomy and Hysterectomy:* Because these major surgical procedures pose a "risk to the mother [that is] manyfold greater" than other abortion techniques such as the vacuum curettage, D & E, or labor induction, these procedures are only used as an abortion method in exceptional circumstances, as when cervical carcinoma is found in a woman with an advanced pregnancy and a hysterectomy would "take care of both things at the same time." (Tr.2d 46:20–47:22.)

61. Dr. Stubblefield has observed a variety of reasons a woman may seek an abortion after 16 weeks' gestation, including a woman's delay in seeking an abortion due to her youth or other barriers; "[w]omen who are finally deciding to leave their abusive spouse"; and development of a serious maternal or fetal disease or malformation which was previously unknown. (Tr.2d 50:2–51:11.)

62. Geneticists and internal medicine specialists have requested that Dr. Stubblefield provide intact aborted fetuses to them "so that it's easy for the pathologist to examine the fetus and confirm the diagnosis" in cases of fetal malformation. (Tr.2d 51:12–20.) In the past, Dr. Stubblefield has declined such requests because he felt that "in [his] hands, the D & E procedure was safer and easier on the woman than going through labor induction. Now that [the intact D & E] is available, were I in this circumstance now, I think I would try to provide the intact D & E." (Tr.2d 51:21–52:1.)

63. Dr. Stubblefield opined that the "only way . . . to avoid" delivering into the vagina a "living unborn child, or a substantial portion thereof," as stated in LB 23, is to either (1) perform a "significantly riskier" abdominal operation, such as hysterotomy or hysterectomy, so that "nothing is delivered into the vagina" or (2) cause fetal demise prior to beginning any abortion procedure in every case. (Tr.2d 56:16–23; 57:3–8.) With the latter option, one would perform an amniocentesis in an attempt to inject the fetus with potassium chloride or digoxin to stop the fetus' heart. The risks of such an injection are traversing the bowel and carrying bacteria from the bowel into the uterus, thereby causing a rapidly progressing infection, as in the case Dr. Stubblefield described above; spearing a blood vessel and causing significant bleeding; and inappropriate injection of the substances into the mother's bloodstream, causing danger to her. While causing fetal demise by injection is commonly done after 20 weeks' gestation in order to cause decomposition and softening of the fetus so it can be easily removed with instruments, "to [cause fetal demise] at eight weeks would be ridiculous. It would be hard to do, take great skill to do it. You couldn't do it predictably without injuring the mother." (Tr.2d 58:10–24.)

### E. Dr. Riegel

64. Defendants presented Dr. Christopher Riegel, an obstetrician, gynecologist, and infertility specialist from Dallas, Texas, as an expert witness to challenge the testimony presented by Drs. Carhart, Hodgson, and Stubblefield, discussed in detail above. Dr. Riegel received his medical degree from the University of Texas in 1987 and completed a one-year internship in pediatrics at Children's Medical Center in Dallas in 1988 and a

four-year internship and residency in obstetrics and gynecology at Parkland Hospital at the University of Texas before entering private practice in 1992. Dr. Riegel became board-certified in obstetrics and gynecology in 1995. (Tr. 232:13–234:9.)

65. Dr. Riegel does not perform abortions due to moral objections and claims to be familiar with abortion procedures, risks, complications, and contraindications only from reading technical bulletins and textbooks and by becoming, during his service as chief resident in labor and delivery, "acquainted with what goes on" in medically indicated induction abortions of fetuses having malformations incompatible with life. His experience consists of attending at abortions that were already in progress when he arrived to complete the procedure. (Tr. 236:7–8; 238:12–239:8; 274:15–20; 275:16–22; 277:4–17.) Dr. Riegel has never observed a D & E abortion because he has "chose[n] not to be associated with them." (Tr. 276:11–20; 276:23–277:3.) Dr. Riegel testified that the intact D & E or D & X procedure is not medically recognized and in fact "does not exist." (Tr. 295:17–297:25.)

66. Dr. Riegel testified it is generally medically accepted that a fetus is dead if its heart stops beating (Tr. 236:14–20); injection of potassium chloride or digoxin into the heart of a fetus to cause fetal demise is generally done at 19 weeks' gestation or more (Tr. 244:8–245:4); in the hands of a skilled operator, the risk of perforating the maternal bowel or injecting the mother with digoxin or potassium chloride during such a procedure is "inconsequential" (Tr. 245:9–22); the risk of complications for a mother with a preexisting seizure or heart disorder from using such an injection to cause fetal demise is nonexistent, "rare," "low," or "minuscule" (Tr. 247:22–249:22); there is no maternal medical advantage to injecting a substance into a fetus while it is in the uterus in order to kill the fetus before removing it (Tr. 250:3–22); there is no maternal medical advantage to partially delivering the fetus alive, killing it, and then completing delivery, with the latter scenario involving the "blind" use of a sharp instrument in the vagina accompanied by risk of damage to the urethra, bladder, vaginal wall, cervix, and uterus (Tr. 255:13–18; 256:6–257:24; 292:4–5); no type

of fetal tissue or amniotic fluid should enter the mother's bloodstream (Tr. 259:4–9); beginning at 16 weeks' gestation, Dr. Riegel uses induction instead of D & E to remove dead fetuses from the uterus, and if the patient has heart disease, diabetes, renal disease, or a prior Cesarean section, he refers her to a high-risk obstetrician (Tr. 264:17–19; 266:1–24; 272:13–15; 293:15–23); since 1988 Dr. Riegel has delivered by induction 10 to 20 demised fetuses at 16 weeks' gestation or later (Tr. 303:24–304:5); and in his geographical area of practice, it is generally accepted that amniocentesis at 13 to 18 weeks' gestation is performed only by high-risk obstetricians (Tr. 279:24–25; 284:25–285:5).

67. With regard to induction by prostaglandin injection, a process which requires hospitalization, Dr. Riegel described the side effects of nausea, vomiting, diarrhea, and fever that accompany the injections the patient receives every three hours and the 8- to 36-hour time frame the induction procedure requires. (Tr. 306:5–307:23.)

### F. Dr. Boehm

68. Defendants' witness Dr. Frank Boehm received his B.A. and M.D. from Vanderbilt University in Tennessee in 1962 and 1965, respectively. He completed a surgery internship and obstetrics-gynecology residency at Yale–New Haven Hospital in Connecticut, as well as a six-month fellowship in surgery and oncology at City of Hope in Duarte, California. Dr. Boehm has had numerous academic and professional appointments; has served as an editorial consultant for seven medical journals; and has authored numerous articles, book chapters, books, abstracts, and presentations dealing with various issues in obstetrics and gynecology. Dr. Boehm is board-certified in obstetrics and gynecology and maternal fetal medicine, and he has practiced in those areas since 1966. He is a fellow of the American College of Obstetricians and Gynecologists, and is currently a professor of obstetrics and gynecology at the Vanderbilt University School of Medicine and Director of Obstetrics for the hospital. (Ex. 23, Boehm *Curriculum Vitae;* Ex. 32, Dep. of Dr. Boehm, at 3:1–3.)

69. In the past 25 years, Dr. Boehm has performed well over 100, but less than 1,000

abortions, with a focus on second-trimester, congenital-anomaly abortions involving serious malformations in the fetus. (Ex. 27, Videotaped Dep. of Dr. Boehm, at 8:8–9:4.) Dr. Boehm does not perform abortions after 22 weeks and six days of gestation. (Ex. 27, Videotaped Dep. of Dr. Boehm, at 13:21–14:11.) Dr. Boehm has performed the suction D & C, the D & E, labor-induction, and hysterotomy methods of abortion. He has not performed the intact D & E or D & X procedure, nor has he been present when other physicians have performed those procedures. (Ex. 27, Videotaped Dep. of Dr. Boehm, at 15:16–16:16.) He has not performed a D & E abortion in 10 to 15 years. (Ex. 27, Videotaped Dep. of Dr. Boehm, at 48:3–7.) In his current position, Dr. Boehm teaches the suction and sharp D & C, the prostaglandin abortion, and the hysterotomy as part of Vanderbilt's residency program. (Ex. 27, Videotaped Dep. of Dr. Boehm, at 13:9–20.)

70. Dr. Boehm is not familiar with any studies that have evaluated the trauma to a woman's uterus, cervix, or other vital organs when the intact D & E or D & X procedures are used. (Ex. 27, Videotaped Dep. of Dr. Boehm, at 16:8–17:8; 19:12–22.) Without data evaluating safety of the D & X procedure compared to other abortion procedures, Dr. Boehm does not believe the intact D & X abortion procedure is safer than other abortion procedures. (Ex. 27, Videotaped Dep. of Dr. Boehm, at 23:22–24:17; 32:10–21.) Specifically, Dr. Boehm opined that choice of abortion technique does not to "any significan[t]" degree affect the risk of developing disseminated intravascular coagulopathy (DIC), and that amniotic fluid embolus can occur "any time you are manipulating intrauterine cavity"—as would be the case when performing a D & C, D & E, Cesarean section, or labor and delivery—so selection of abortion method does not affect the risk of developing this condition. (Ex. 27, Videotaped Dep. of Dr. Boehm, at 33:10–34:10; 34:11–35:15.) Dr. Boehm also testified as follows with regard to maternal safety when an entire fetus is removed intact during a D & E procedure:

Q. [W]ould it be reasonable to conclude that by removing [a fetus] in one piece, there is less risk of leaving fetal tissue behind?

A. Sure.

Q. And would it be reasonable to conclude that there's less risk of sharp fetal fragments puncturing the uterus?

A. Sure.

Q. And therefore would it be reasonable to conclude that removing the fetus intact might be safer for the woman?

A. Might be.

Q. But you'd need a good study to determine whether it really was?

A. I think that's a reasonable statement.

(Ex. 27, Videotaped Dep. of Dr. Boehm, at 45:1–46:1.)

71. Dr. Boehm believes there are safe alternatives to the intact D & E or D & X procedure, but "[h]ow safe [these procedures are] compared to other procedures is something that we really don't know because no one has ever done any research on partial birth abortion and compared it to other procedures.... So it's all theory.... there are safe alternatives that have set some moral and ethical guidelines and work[ ] within a framework that I think is healthy for—more mentally healthy for the health care providers as well as for the patient." (Ex. 32, Dep. of Dr. Boehm, at 27:7–22.)

72. In response to plaintiff's counsel's question about abortion techniques that were commonly used shortly after *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), in comparison to those used now, Dr. Boehm testified that the medical community no longer uses saline abortions because "[w]e have better techniques and techniques that are not associated with as high an incidence of problems.... I don't think anyone has compared saline with intravaginal prostaglandin which is what's used today, but I would think it's safer from what—this would be anecdotal experience over years of performing both, that the saline was not as safe as the intravaginal prostaglandin procedure." Although there were no statistical studies

comparing the relative safety of these procedures, Dr. Boehm testified that he felt "comfortable making that transition" from one procedure to another. (Ex. 27, Videotaped Dep. of Dr. Boehm, at 73:9–74:17.)

73. Dr. Boehm believes that the procedure contemplated by LB 23, and by a similar Tennessee law, "represents a departure from what is morally and ethically acceptable by the medical profession and especially those of us who agree with prochoice and who perform abortions." (Ex. 27, Videotaped Dep. of Dr. Boehm, at 32:4–9.) Dr. Boehm believes that legislative bills like LB 23 are "about as close as we can hope for in demonstrating to the public that the medical profession and the states are willing to state certain moral and ethic[al] frameworks of how we offer and administer the process of abortion." Because there "is no medical need" for the procedure banned by LB 23 and "there are safe alternatives," it is Dr. Boehm's opinion that "such a procedure should be banned so as to comfort the general public in this country that abortions are not in the hands of callous extremists." (Ex. 27, Videotaped Dep. of Dr. Boehm, at 66:23–68:1; Ex. 25 at 2.)

74. Dr. Boehm testified that he understands the definition of "partial-birth abortion" as used in LB 23, and he believes a ban on such procedure would not pose an adverse medical risk to the health of any woman seeking an abortion because there are safe alternatives to such a procedure, such as labor induction. (Ex. 27, Videotaped Dep. of Dr. Boehm, at 25:8–26:7.) Dr. Boehm testified that a prostaglandin induction abortion takes approximately 24 hours, and involves "[c]ontractions, cramps which we give epidurals for to reduce discomfort. They're in a labor bed. They have an intravenous going, running. We administer the prostaglandin intravaginally and wait for contractions, given them pain relief, and then they deliver." (Ex. 32, Dep. of Dr. Boehm, at 17:9–17.) Live 20–week fetuses have been born "alive ... [t]hat is[,] the heart will be beating" during prostaglandin inductions. (Ex. 32, Dep. of Dr. Boehm, at 21:18–22.)

## G. Credibility of Witnesses Giving Medical Testimony

75. Having observed the witnesses' demeanor and listened to their testimony, the court finds the testimony of Drs. Carhart, Hodgson, Stubblefield, and Boehm to be credible based on their extensive training, experience, and knowledge of abortion procedures, whereas Dr. Riegel's testimony regarding abortion procedures is generally not credible. In particular, the court found Dr. Stubblefield particularly persuasive. He possessed the most extensive training, experience, and knowledge about the use and teaching of abortion procedures. These factors, coupled with his demeanor, made his testimony the most helpful. Putting aside each witness's views about the morality of abortion, the court's judgment of the strength of the witnesses' medical testimony is based solely on general indicia of credibility such as demeanor, candor, and each witness's training, experience, and knowledge about medicine in general and abortion in particular.

76. Dr. Riegel has never observed or performed a D & E. He has only completed medically indicated induction abortions of fetuses having malformations incompatible with life in situations where the abortion was already in progress when he arrived on the scene. This limited experience occurred when he was a medical resident. Furthermore, as the AMA report proves, (Ex. 7, at 8), Dr. Riegel was poorly informed regarding use of the intact D & E or D & X procedure when he stated that the procedure—which is, after all, the focus of this case—simply "does not exist." (Tr. 297:22–25.)

## H. Statistical Risks and Frequency Associated With Abortion Procedures

77. Overall maternal mortality rates for the D & E, labor induction, and hysterectomy/hysterotomy methods of abortion at 13 weeks' gestation or later are 51.6 per 100,000 abortions for hysterectomy/hysterotomy, 7.1 per 100,000 abortions for labor induction, and 3.7 per 100,000 abortions for D & E. Mortality rates resulting from labor induction and D & E performed at 16 to 20 weeks are 7.9 and 6.5 respectively, and 10.3 and 11.9 respectively at 21 weeks or more. (Ex. 7, at 10, tbl. 4: Maternal Mortality Rates for Induced Abortion Procedures at 13 Weeks' Gestation or Later, U.S., 1974–1987.) The AMA report

summarizes these statistics as follows: "Maternal mortality rates, overall, are higher for labor induction than D & E (7.1 and 3.7, respectively), but mortality rates resulting from labor induction and D & E are comparable for induced abortions performed at 21 weeks or more (11.9 and 10.3)." (Ex. 7, at 9:39–41; 11:28–30.)[21] Dr. Hodgson stated that induction beyond weeks 18 to 20 "can be made as safe" as the D & E procedure resulting in dismemberment. (Tr. 212:1–3.)

78. While concluding that more systematic research is needed on complication rates associated with various abortion procedures performed at 13 weeks' gestation and beyond, the AMA report cited statistics from the "best available national data on complications" collected during the 1970s by the Joint Program for the Study of Abortion, sponsored by the Population Council and the CDC. According to the report, the complication rate associated with vacuum aspiration was 2 per 1000 procedures; D & E had a complication rate of 7 per 1000 procedures; labor induced by saline or prostaglandin injection had rates of 21 and 25 per 1000 procedures respectively; and abortion methods involving major surgery had the highest rate of complications. (Ex. 7, at 10:20–26; 10:43–48; 11:30–31.)

79. Forcing a woman to wait until post-20-weeks' gestation so that Carhart may be able to achieve fetal demise prior to performing an abortion drastically increases the risk of complications. According to the studies with which Carhart is familiar, abortion at the earliest stage is 35 times safer than childbirth as far as complications are concerned. By the 20th week, the risk of complications from abortion approximately equals that of childbirth. (Tr. 135:18–136:9, Carhart Test.; Tr. 59:9–10, Henshaw Test.)

80. The complication rate from abortion increases by about 20 percent for each week of gestation past eight weeks. (Tr. 59:11–14, Henshaw Test.)

81. According to his analysis of data from the Nebraska Department of Health and Human Services, Dr. Henshaw opined that D & E is the prime method of abortion performed in Nebraska after the first trimester of pregnancy. Of the 5,214 reported abortions in Nebraska in 1996, 5,161 were performed by suction curettage, the prime method for first trimester abortions; 550 were performed by "sharp curettage" which were "most likely D & E's"; no inductions were performed; and 49 abortions recorded as "other" were most likely drug-induced abortions prior to eight weeks' gestation. (Tr. 49:4–50:9; Ex. 9, Neb. 1996 Statistical Report of Abortions at 2, 4 (tbls. 1, 5).)

82. Nationwide approximately 86 percent of abortions past 15 weeks are performed by curettage, or D & E, while induction is performed in less than 10 percent of abortions past 15 weeks. (Tr. 50:15–51:9; Ex. 17, 1992 Abortion Surveillance Report, tbl. 16, reported legal abortions, by weeks of gestation and type of procedure—U.S., 1992 (Centers for Disease Control 1992).)

83. The number of curettage, or D & E, procedures reported in Nebraska and across the nation also includes the intact D & E or D & X,[22] so there is "no way to quantify how many of the D & X abortions are done based on the statistics collected by the State [of Nebraska] or the CDC." (Tr. 52:1–5, Henshaw Test.)

84. According to a study by Dr. Henshaw, only 25 abortions, or .4 percent of the total, were performed in Nebraska hospitals in 1992, and only three Nebraska hospitals reported performing abortions that year. Two of the three indicated a referral must be made by an attending physician, and one hospital did not answer the question, leading Dr. Henshaw to conclude that a woman cannot arrange an abortion directly with a Nebraska hospital. Although no such information was requested in the 1992 survey, one

---

**21.** Carhart stated that the complicating effects of anesthesia use during induction were responsible for one-third of the total deaths occurring as a result of abortion. It is not clear whether this was factored into the AMA report's statistics on the risk of the induction procedure. If not, the risk of induction would be higher than indicated in the AMA report. (Tr. 180:14–181:18.)

**22.** Carhart testified that he records intact D & E or D & X procedures under "Dilation and evacuation (D & E)," (Ex. 11), or "suction curettage," (Ex. 12), on various Nebraska abortion-reporting forms. (Tr. 128:1–129:24.)

Nebraska hospital reported that abortions were permitted only for therapeutic reasons. (Tr. 55:10–56:19.)

### I. Interpretation of LB 23

85. *Dr. Carhart:* Dr. Carhart does not understand the meaning of "substantial portion," as used in the definition of "partial-birth abortion" in LB 23. "I think it could mean any identifiable part of the fetus. I think it could mean the umbilical cord. I think it could mean an extremity, I think it could mean a portion of an extremity, a foot, a toe, a hand, a finger. I think it could mean a portion of the skull, if it's a face-first presentation, where the forehead protrudes from the cervical os before anything else come out." (Tr. 89:7–90:5.) "Living unborn child," as used in the same definition, has no medical meaning in Dr. Carhart's opinion, as compared to a living fetus, which is a fetus that has a heartbeat and is undergoing normal genetic or embryonic development. (Tr. 90:6–24.)

86. *Dr. Hodgson:* Dr. Hodgson believes that LB 23, as written, applies to 95 percent of all abortion procedures because during these procedures, portions of a fetus can enter the vagina spontaneously when the fetus is still living, and with all abortions, a physician begins the procedure with a live fetus with the intent to end the procedure with a dead fetus, and at what point that death occurs is "extremely variable." (Tr. 216:17–219:7.) Dr. Hodgson thinks heartbeat is the best measure of a "living" fetus currently available. (Tr. 219:16–220:3.)

87. *Dr. Stubblefield:* The term "partial-birth abortion," as used in the Nebraska LB 23, is not a term Dr. Stubblefield has encountered in medical textbooks or articles. The phrase "partially delivers vaginally," as it appears in the definition of "partial-birth abortion" in LB 23, "are words that a non-medical person has made up. I presume they mean pull a piece of the fetus down into the vagina and out of the vagina." (Tr.2d 54:16–55:8.) Dr. Stubblefield interpreted the phrase "delivering into the vagina a living unborn child" in the definition of "partial-birth abortion" to mean to "pull the fetus [from within the uterus and through the cervix and] down into the vagina," but not necessarily outside of the woman's body. (Tr.2d 55:13–22.) Dr. Stubblefield testified that the

meaning of "deliberately and intentionally delivering into the vagina a living unborn child, or a substantial portion thereof" in LB 23 was "[s]ubject to opinion" because "[t]here is no legal or medical definition of what constitutes a substantial portion of an unborn child." (Tr.2d 55:23–56:5.) Dr. Stubblefield testified that if "substantial portion" meant "more than a little bit of the fetus," LB 23 "would be precluding most surgical abortions, making it illegal." (Tr.2d 62:5–12.)

With reference to the language in LB 23 that defines "partial-birth abortion" as being "for the purpose of performing a procedure that the person performing such procedure knows will kill the unborn child and does kill the unborn child," Dr. Stubblefield stated that physicians know that "[a]ll of the surgical abortion procedures, vacuum curettage, all variations of a D & E" will kill unborn children. (Tr.2d 56:6–15.) As stated above, Dr. Stubblefield opined that the "only way . . . to avoid" delivering into the vagina a "living unborn child, or a substantial portion thereof," as stated in LB 23, is either to (1) perform a "significantly riskier" abdominal operation, such as hysterotomy or hysterectomy, so that "nothing is delivered into the vagina" or (2) cause fetal demise prior to beginning any abortion procedure in every case. (Tr.2d 56:16–23; 57:3–8.)

88. *Dr. Riegel:* "Substantial portion," as used in LB 23, means "probably over 50% of the size [of the fetus] probably would be what that would mean. It's a vague term," according to Dr. Riegel. (Tr. 315:7–25.) Dr. Riegel does not think LB 23 contemplates removal of a fetal leg from a woman's uterus while the remainder of the fetus is still living inside the uterus; instead, he thinks the procedure addressed by LB 23 is delivery of 50 to 75 percent of the fetus—or up to the fetus' chest or head—"and then the life of the baby is specifically ended at that point before the head comes out . . . ." (Tr. 316:8–23; 318:16–20.)

89. *Dr. Boehm:* As he reads the language of LB 23, Dr. Boehm believes LB 23 prohibits the intact D & E. (Ex. 27, Videotaped Dep. of Dr. Boehm, at 53:15–18.) Dr. Boehm testified that he understands the definition of "partial-birth abortion" as used in LB 23, and

he believes it includes the procedure as defined by ACOG; that is, intentional dilation of the cervix, conversion of the fetus to a breech, extraction of the fetus to the head, and evacuation of the intracranial contents. (Ex. 27, Videotaped Dep. of Dr. Boehm, at 25:8–11; Ex. 32, Dep. of Dr. Boehm, at 31:2–18.) Dr. Boehm concedes that "some people might consider a hand or a leg to be a substantial portion" within the meaning of LB 23, but he interprets that phase to mean "more than a hand or a leg." (Ex. 27, Videotaped Dep. of Dr. Boehm, at 61:3–11.)

> I think you'd have to bring in a reasonably large portion of the fetus through the birth canal. And I'm not sure that I can define that, but I don't think anyone has or could. So I think that's where some people have been concerned.

> I feel substantial portion means a significant portion of the fetus. And while I could say greater than half of the body, that would be my own personal view and not necessarily the view of someone who wants to prosecute this letter of the law.

(Ex. 32, Dep. of Dr. Boehm, at 33:17–34:1.)

### J. Fear of Prosecution

90. Carhart fears prosecution under LB 23 because the Nebraska Attorney General's Office and the State Department of Health are both aware of, and have investigated, his performance of abortions in the past. (Tr. 136:10–137:22; Ex. 20, Letter from Att'y Gen.'s Office to Carhart of 11/22/95; Ex. 21, Letter from State Dep't of Health investigator to Carhart att'y of 10/9/96.)[23]

## II. CONCLUSIONS OF LAW

Before addressing the merits of this case, I pause to note two things. First, I have previously found that the court has subject matter jurisdiction; that this case is ripe for decision; and that Carhart has standing for himself and for his patients. *Carhart I*, 972 F.Supp. at 520–21. No one has challenged these decisions. In any event, I again decide that the court has subject matter jurisdiction; that this case is ripe for decision; and that Carhart has standing for himself and for his patients. *Id.* Second, the facts and conclu-

sions expressed in *Carhart I* have not been altered by the additional evidence or the passage of time. For the sake of convenience, I simply incorporate those facts and conclusions into this opinion as if I set them forth verbatim. With that said, I now address the merits of this case.

### A. The Court Declines to Review the Facial Validity of the Law.

Contrary to the Dr. Carhart's earlier position, *Carhart I*, 972 F.Supp. at 522–23, he now challenges Nebraska's law as it is applied *and* on its face. The defendants do not object to this change in position. As a matter of fact, they also urge me in their brief to reach the question of whether the law is facially valid.

A law may be challenged as unconstitutional in two ways. The law may be challenged "as applied" and "facially." *See, e.g., Ada v. Guam Soc. of Obstetricians & Gynecologists*, 506 U.S. 1011, 1012–13, 113 S.Ct. 633, 121 L.Ed.2d 564 (1992) (Scalia, J. dissenting); *WMPC II*, 130 F.3d at 193–94; Michael C. Dorf, *Facial Challenges to State and Federal Statutes*, 46 Stan. L.Rev. 235 (1994). If the law is judged unconstitutional on facts peculiar to the plaintiff, then the law is unconstitutional "as applied." *Ada*, 506 U.S. at 1013, 113 S.Ct. 633 (Scalia, J. dissenting) If, on the other hand, the law is found unconstitutional regardless of how it might be applied to a particular plaintiff then the law is said to be facially unconstitutional. *Id.* The difference between the two challenges is this: if a law is facially invalid it cannot be enforced against anyone, but if a law is unconstitutional "as applied," while it cannot be enforced against the plaintiff (or others like him), the law is otherwise generally enforceable. *Id.*

I am not persuaded that it is proper to reach the question of whether Nebraska's partial-birth abortion law is facially valid. My reasons for this decision are set forth below.

First, there is currently a dispute among members of the Supreme Court regarding

---

23. These exhibits were received to the extent they are relevant to Carhart's fear of prosecution.

(Tr. 6:18–7:23; 9:19–21.)

whether a successful "facial" challenge to an abortion law requires proof that in "no set of circumstances" is the law valid or whether it is enough to show the law is invalid "in a large fraction of cases." *Compare, e.g., Janklow v. Planned Parenthood, Sioux Falls Clinic,* 517 U.S. 1174, 1583, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996) (Justice Stevens) *with Janklow v. Planned Parenthood, Sioux Falls Clinic,* 517 U.S. at 1584, 116 S.Ct. 1582 (Justice Scalia) (commenting upon denial of certiorari). The defendants argue that this dispute has caused our circuit court to take positions that are contradictory and they urge me to apply the more restrictive of the two tests. *Compare Planned Parenthood, Sioux Falls Clinic v. Miller,* 63 F.3d 1452, 1458 (8th Cir.1995) (applying "in a large fraction of cases" test), *cert. denied,* 517 U.S. 1174, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996), *with Fargo Women's Health Organization v. Schafer,* 18 F.3d 526, 529 (8th Cir.1994) (applying both tests but stating "the [stricter] standard remains the law.'") If I can avoid reaching an issue that is apparently subject to debate even among the Justices, it seems prudent to do so.

Second, and more importantly, the Supreme Court has suggested that a lower court faced with an "as applied" and a "facial" challenge can, and probably should, avoid deciding the "facial" challenge if the law "as applied" is unconstitutional and the decision on that point resolves the controversy between the litigants. *See, e.g., Renne v. Geary,* 501 U.S. 312, 323–24, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991) (suggesting that resolution of the "as applied" challenge first was the "better course" because that procedure avoided " 'gratuitous wholesale attacks upon state and federal laws.'") (quoting *Board of Trustees of State University of N.Y. v. Fox,* 492 U.S. 469, 484–85, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)).[24]

Since I will invalidate the Nebraska "partial birth abortion" statute as applied to Dr.

Carhart and his patients (and similarly situated persons), numerous prudential considerations counsel against reaching the "facial" challenge. For example, due to the absence of specific evidence about other doctors and patients, a facial challenge forces me to guess about a wide variety of fact patterns that might occur in various unknown surgical suites involving various unknown doctors and patients with various unknown motives and conditions. Moreover, since Carhart is the only doctor in Nebraska who performs these types of late-term abortions, but he does not perform abortions after viability, one wonders why it is advisable to reach the facial question under any circumstance. In any event, the Supreme Court has suggested that if a judge is not required to guess about such things, the judge ought to refrain from doing so, *Renne,* 501 U.S. at 323–24, 111 S.Ct. 2331, and that is what I will do.

In summary, because I find Nebraska's law unconstitutional as applied to Dr. Carhart and his patients, it is unnecessary to decide whether Nebraska's law is facially invalid. I therefore decline to decide the facial invalidity question, and I express no opinion whatever on the matter.

### B. "As Applied" to Dr. Carhart, Nebraska's Law is Unconstitutional.

Dr. Carhart essentially makes three arguments.[25] Each one has merit.

First, the D & X procedure that Dr. Carhart performs is the safest procedure to use when he uses it. Therefore, the law imposes an undue burden on the doctor and his patients because the law forces an unconstitutional trade-off. In other words, Nebraska's law forces women and their doctors to unnecessarily use an appreciably riskier procedure to promote nonviable fetal well-being.

Second, Nebraska's "partial-birth" abortion law bans the D & E procedure because

---

24. Dr. Carhart concedes that the court may avoid the "facial" challenge if the court finds the law invalid "as applied" to him. "This dual request by the plaintiff does not require the Court to consider the requests in any particular order, nor does it require the Court to reach both challenges if it finds for the plaintiff on one challenge." Plt's Post–Trial Br. at 1 n.1. (Citation omitted.)

25. Before arguing that the law is invalid because it is an "undue burden," the plaintiff asserts that he need not show an "undue burden." Essentially, the plaintiff argues that once a woman has chosen to have an abortion the state cannot constitutionally dictate the choice of method. I find it unnecessary to reach this argument.

when a fetus is dismembered the dismemberment routinely involves an intentional and deliberate vaginal delivery of a "substantial portion" of the intact fetus in order to accomplish dismemberment. Since the D & E procedure is the most frequently performed abortion procedure and is universally regarded as being safer than any other procedure (save for the intact D & E or D & X which is a variant of the standard D & E) the law imposes an undue burden; that is, the law forces an unconstitutional trade-off by requiring women and their doctors to unnecessarily accept appreciably greater risk to promote nonviable fetal well-being.

Third, the law is void because the words "substantial portion" are vague. In other words, a doctor of reasonable competence cannot know from a plain reading of the words what "substantial portion" means, and, as a result, a reasonable doctor and patient cannot be expected to conform his or her conduct to Nebraska's law. Moreover, the law is ripe for arbitrary enforcement.

Before discussing these arguments in detail, it is necessary to be precise about what Carhart does and does not do. The following summary is therefore presented:

1. Carhart does not intentionally perform abortions on viable fetuses.

2. Between the 16th and 20th week, Carhart performs both the D & E procedure and a variation of the D & X [26] (sometimes called intact D & E).

3. The D & E procedure used by Carhart involves the following: (a) inserting an instrument into the uterus; (b) grasping a part of the living fetus, such as a limb; (c) pulling the fetal part through the cervix; and (d) shearing the part from the body by means of traction where the end of the cervix (cervical os) is the leverage point.

4. The D & X procedure used by Carhart involves the following: (a) if the fetus is in the footling breech position (feet first), inserting an instrument into the uterus and grasping the living fetus; (b) pulling the intact living fetus, except the head, through the cervix from the uterus into the vaginal cavity; (c) draining or crushing the fetal skull which is too large to pass through the cervix unless the size of the skull is reduced.[27]

5. Carhart's D & X procedure is similar to Dr. Haskell's procedure except for two variations. Unlike Haskell, Carhart does not intentionally convert the fetus to a footling breech; that is, he takes the fetus as he finds it. If the fetus presents feet first, Carhart will do a D & X. If, on the other hand, the fetus does not present feet first, Carhart will do a D & E.[28] Moreover, Carhart will do the D & X procedure between the 16th week and the 20th week unlike Dr. Haskell who uses the procedure between the 20th and 24th week.

6. Carhart performs about 190 abortions a year between the 16th week and the 20th week. In each of these 190 cases Carhart always tries to do the D & X procedure because he believes it is obviously safer. However, because the fetus does not always present feet first and Carhart will not try to convert the fetus to a footling breech, Carhart is able to perform the D & X procedure 10 to 20 times a year. If he cannot perform the D & X, Carhart will do a D & E.

7. After 20 weeks, Carhart induces fetal death by injection unless the woman suffers from a seizure disorder or heart dis-

---

**26.** "Partial-birth abortions" are "known medically as intact dilatation and extraction, or D & X." Julie Rovner, *US Senate Rejects Post–Viability Abortion Ban*, 349 THE LANCET 9064 (May 24, 1997). According to *The Lancet*, "[T]he vast majority of D & X abortions are performed either before the fetus is viable or when viability is extremely doubtful." *Id. The Lancet* is "the United Kingdom's leading medical journal." *LaMontagne v. E.I. Du Pont De Nemours & Co.*, 41 F.3d 846, 850 (2d Cir.1994).

**27.** The defendants object to my description of the procedure. While they do not suggest that I have been inaccurate, they suggest that I have not been graphic enough. For example, they would like me to state "that the procedure literally sucks the brains out of a living partially born child." Post–Trial Br. of Defs. at 11 n.2. It would not be helpful to respond to this objection and other provocative statements contained in defendants' otherwise well-written brief.

**28.** Other doctors use this variation as well. *WMPC I*, 911 F.Supp. at 1067 n. 20 (Dr. Doe Number Two).

ease or is taking medication that contraindicates use of injection.

With the foregoing summary in mind, I now turn to the arguments advanced by Carhart and the defendants.

## 1. Because the Law Bans the D & X Procedure, it Imposes an "Undue Burden" on Dr. Carhart and his Patients; that is, in Dr. Carhart's Hands the D & X Procedure is the Safest Procedure in Certain Circumstances.

### (a)

■ The defendants have conceded that Nebraska's law would prohibit Carhart from using his version of the D & X procedure. Specifically, the defendants have stated that 10 to 20 D & X abortions performed by Carhart in 1996 would have been prohibited by Nebraska law. *Carhart I*, 972 F.Supp. at 520. As a consequence, I must determine whether that prohibition is constitutional.

■ An abortion law is invalid if it places an "undue burden" in "the path of a woman seeking an abortion before the fetus attains viability." *Planned Parenthood v. Casey*, 505 U.S. 833, 878, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). An "undue burden" can arise in two circumstances; that is, one examines the "purpose" and "effect" of the law. If the legislature intended to place a substantial obstacle in the path of a woman seeking an abortion, then an undue burden exists. *Id.* at 877, 112 S.Ct. 2791. If the effect of the law is to place a substantial obstacle in the path of a woman seeking an abortion, then an "undue burden" has been proven. *Id.*

■ It is beyond dispute that "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden." *Id.* at 878, 112 S.Ct. 2791. The Supreme Court and lower federal courts have consistently held that abortion regulations that impose medically unnecessary health risks on women are invalid. *See, e.g., Thornburgh v. American College of Obstetricians & Gynecologists*, 476 U.S. 747, 768, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) (state law not susceptible to construction that did not

" 'require the mother to bear an increased medical risk in order to save her viable fetus' " was unconstitutional) (citation omitted)[29]; *Colautti v. Franklin*, 439 U.S. 379, 400, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979) (state law requiring a doctor to use the technique that provided the best opportunity for the viable fetus to be aborted alive was unconstitutional because it was uncertain whether the law permitted "the physician to consider his duty to the patient to be paramount to his duty to the fetus"); *Planned Parenthood of Missouri v. Danforth*, 428 U.S. 52, 79, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (state law that "forces a woman and her physician to terminate her pregnancy by methods more dangerous to her health than the method outlawed" was unconstitutional); *Jane L. v. Bangerter*, 102 F.3d 1112, 1118 n. 7 (10th Cir.1996), *cert. denied sub nom. Leavitt v. Jane L.*, — U.S. —, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997) (Utah's choice of method statute was unconstitutional because " 'by requiring a woman to suffer "grave damage" to her health before her liberty interests predominate, the Utah legislature violated those portions of *Roe* and *Thornburgh* ... that *Casey* reaffirmed and unconstitutionally devalued a woman's privacy rights.' ") (quoting *Thornburgh*, 476 U.S. at 769, 106 S.Ct. 2169 and *Jane L. v. Bangerter (IV)*, 61 F.3d 1493, 1502–1504 (10th Cir.1995), *rev'd in part on other grounds sub nom. Leavitt v. Jane L.*, 518 U.S. 137, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996) (per curiam)); *WMPC I*, 911 F.Supp. at 1070 (D & X procedure "appears to pose less risk to maternal health than any other alternative"; therefore, the ban had the "effect of placing a substantial obstacle in the path of women seeking pre-viability abortions" and was "an undue burden and thus unconstitutional under *Casey* ").

I have previously found that Nebraska's ban on the variant of the D & X procedure performed by Carhart has the "effect" of subjecting his patients to an appreciably greater risk of injury or death than would be the case if these women could rely upon Dr. Carhart to do his variant of the banned

---

**29.** *Thornburgh v. American College of Obstetricians & Gynecologists*, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), *overruled in part on other grounds in Casey*, 505 U.S. at 870, 882, 112 S.Ct. 2791 (O'Connor, Kennedy, & Souter, JJ.).

procedure when medically advisable. *Carhart I*, 972 F.Supp. at 523–28. The result is an undue burden under *Casey*.

I have also previously set forth in detail why it has been proven that Nebraska's law endangers women by prohibiting Dr. Carhart, a well-trained former head of surgery at a large Air Force hospital, from performing the D & X procedure when medically advisable. Without reciting again each particular, the following summary is provided:

1. Statistically, the D & X procedure is at least as safe as the D & E procedure and appreciably safer than all other forms of abortion. *Carhart I*, 972 F.Supp. at 525.

2. The variant of the D & X procedure used by Carhart is appreciably safer than the D & E procedure, for among other reasons, because (a) it reduces instrumentation in the uterus that can cause damage to the uterus and cervix; (b) it reduces uterine or cervical perforation from bony fragments; (c) it prevents disseminated intravascular coagulopathy (DIC) and amniotic fluid embolus (among the most common causes of maternal mortality and complications); (d) it reduces the likelihood of retained fetal parts (a "horrible complication"); (e) it reduces the risk of "free floating head," an uncommon but significant complication; (f) because the D & X is less time consuming than dismembering the fetus, the woman has less operative time, which means less risk of hemorrhage, less total bleeding and less risk of infection when the procedure is used. *Id.* at 525–27.

3. Inducing fetal death by injection before the 20th week of pregnancy carries with it appreciable maternal health risks, no maternal benefits, and is not always possible. Consequently, if Carhart has to ensure fetal death by injection before the 20th week in order to do a D & X procedure, he endangers his patients for no reason related to the health or life of the patients. *Id.* at 527–28.

4. There is no maternal health benefit in forcing women to wait until after the 20th week so that the fetus can be killed by injection, and there is appreciable risk to maternal health in doing so. Consequently, to the extent the statute requires such a waiting period so that the fetus is dead prior to the commencement of the D & X procedure, Carhart is forced to endanger his patients for no reason related to the health or life of the patients. *Id.* at 528.

5. Cutting the umbilical cord and waiting for the fetus to die before completing the D & X procedure carries appreciable maternal risks, no maternal benefits, and is not always possible. Consequently, to the extent the statute requires such a procedure as a condition for performance of the D & X procedure, Carhart is forced to endanger his patients for no reason related to the health or life of the patients. *Id.*

### (b)

Nothing has been presented at the trial on the merits which causes me to deviate from my previous decision that Nebraska's law endangers women by prohibiting Dr. Carhart from performing his version of the D & X procedure. As a result, I hold that the law is an "undue burden" within the meaning of *Casey* because it has the "effect" of subjecting Dr. Carhart's patients to an appreciably greater risk of injury or death than would be the case if these women could rely upon Dr. Carhart to do his variant of the banned procedure when medically advisable prior to the fetus becoming viable.[30]

Through their able counsel, the defendants advance numerous arguments to support their view that the ban on the D & X procedure does not impose such an undue burden.[31] Only three of those arguments, however, merit a direct response. The defendants continue to argue that the D & X procedure is not recognized by the medical profession, and I should not judge the question in any event. Moreover, the defendants argue that the D & X procedure is not needed since there are other safe alternatives. Finally, the defendants urge the court to hold that the State of Nebraska may constitutionally require women to ac-

---

**30.** Because of this holding, it is unnecessary to decide whether the legislature's purpose in enacting the law was to impose an undue burden.

**31.** The main initial brief of the defendants is 114 pages long.

cept a small increased risk to maternal health or life in order to promote the well-being of a nonviable, yet living, fetus.

### (i)

As if repeating the argument would make it so, the defendants continue to assert that the D & X procedure is not recognized by the medical profession. The evidence is quite to the contrary.

For example, Dr. Phillip Stubblefield, Chairman of the Department of Obstetrics and Gynecology at the Boston University School of Medicine, as well as Chief of Obstetrics and Gynecology at the Boston Medical Center, testified that he has added a description of the D & X procedure to a chapter he regularly writes and revises for *Dr. Nichols's Textbook of Gynecologic Surgery,* and he plans to teach the procedure at the teaching hospital with which he is currently affiliated. (Tr.2d 74:6–11; 80:11–81:12.) Dr. Stubblefield views the D & X technique as a safe method of abortion and he plans to use it himself. (Tr.2d 44:3–10.)

Likewise, Dr. Jane Hodgson, founding fellow of the American College of Obstetrics and Gynecology, past president of the Minnesota Ob/Gyn Society, and author of 50 to 100 published articles on abortion, (Tr. 196:16–24; 197:11–13; Ex. 14, Hodgson *Curriculum Vitae,* at 2) testified that she believes the procedure is a technological advance that has received favorable reports from those who are performing the procedure. (Tr. 212:8–22.) Dr. Hodgson believes the D & X procedure is "an advance in technology" because by removing the fetus intact there is "less instrument manipulation," which means, "of course, the higher your safety." (Tr. 212:4–22.)

Moreover, even a cursory survey of other cases and the literature establishes that the D & X procedure, while certainly new, is well accepted by many highly regarded persons in the medical profession who specialize in abortion related medicine. *See, e.g., Ev-*

*ans v. Kelley,* 977 F.Supp. 1283, 1296 (E.D.Mich.1997) (stating that six doctors, all of them board certified, including a court appointed expert[32] and an expert for the State of Michigan, "all agree" that the D & X procedures "reduce risks associated with conventional D & Es"); *WMPC I,* 911 F.Supp. at 1069 (reciting the testimony of Dr. George Goler, Ohio section chief of the American College of Obstetricians and Gynecologists, who testified that he "views [the D & X procedure] as an improvement over the traditional D & E procedure"); Ann Mac-Lean Massie, *So-called "Partial Birth Abortion" Bans: Bad Medicine? Maybe. Bad Law? Definitely!,* 59 U. Pitt. L.Rev. 301, 371 (1998) (summarizing medical testimony given to the Senate on the federal "partial-birth" abortion ban; stating that the "most objective and expert testimony came from Dr. Warren Hern"; observing that: "Dr. Hern told the Senate Committee: [']The possible advantages of Intact D & E procedure include a reduction of the risk of perforation of the uterus. Since most women seeking abortions are young women who hope to reproduce in the future, having a safe abortion technique for late abortion is of paramount importance, aside from the prevention of complications. Another advantage of the Intact D & E is that it eliminates the risk of embolism of cerebral tissue into the woman's blood stream. This catastrophe can be almost immediately fatal.[']") (hereafter *"Partial–Birth Abortion" Bans* ).[33]

The defendants decry the lack of "studies." To the defendants, the lack of these studies show that the D & X procedure is not accepted by the medical profession. This criticism is both misleading and inaccurate.

Initially, as Dr. Stubblefield pointed out, many accepted surgical techniques (open heart surgery among them) are commonly developed without statistical studies.[34] For example, Dr. Boehm, the defendants' expert,

---

**32.** Both the plaintiff and the defendants declined the court's invitation to appoint a medical expert for the court in this case.

**33.** Dr. Hern also told Congress that although he had not yet used the D & X procedures, he believed that the procedures sought to be banned by the proposed federal "partial-birth abortion" law "are followed by attending physicians throughout the nation when the safety of the woman having the abortion is at issue." *Id.* at 336 (footnote omitted). Dr. Hern is the author of "the principal medical textbook on abortion procedures, and a well-known authority on the subject." *Id.* at 335 & n. 170.

**34.** Food and drug cases are therefore irrelevant.

admitted that he decided to use the prostaglandin form of induction rather than saline form of induction based upon his clinical experience but without such studies. (Ex. 27, Videotaped Dep. of Dr. Boehm, at 73:9–74:17.) Moreover, since the D & X is a less invasive variant of the D & E, and the D & E has been found to be statistically the safest procedure, one can reasonably infer that the D & X is at least as safe as the D & E. Finally, one of the pioneers of the D & X procedure, Dr. Haskell, in fact did a comparative, although not statistically controlled, study. He compared 1000 D & X procedures he performed against 1000 D & E procedures he also performed. Dr. Haskell found the D & X procedure to have fewer complications than the D & E procedure. *WMPC I,* 911 F.Supp. at 1069.

To be sure, there are those doctors, like defendants' expert Dr. Boehm, who profess unfamiliarity with the D & X procedure[35] or who dislike it for political reasons.[36] Nevertheless, it is factually erroneous to argue that the D & X procedure is not recognized by mainstream medical professionals. On the contrary, the procedure is well within accepted medical practice.

The defendants, in a related argument, suggest that this court oversteps its authority in judging the efficacy of the D & X procedure when the Nebraska legislature has come to a contrary conclusion. The defendants suggest that I have no business second guessing the legislature on whether the D & X procedure is an appropriate and necessary surgical technique. I reject this argument.

The Supreme Court has commanded the lower federal courts to enforce the following constitutional principle: "Unnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right [to seek an abortion of a nonviable fetus]" *Casey,* 505 U.S. at 877, 112 S.Ct. 2791. This court cannot fulfill the mandate of the Supreme Court without deciding whether Nebraska's law presents such an undue burden. To make that decision, the court must evaluate the procedure and the reasons for or against use of the procedure. The Supreme Court has not hesitated to evaluate and invalidate state laws that ban specific abortion methods. *See, e.g., Danforth,* 428 U.S. at 75–79, 96 S.Ct. 2831 (striking down prohibition against saline amniocentesis after the first 12 weeks of pregnancy).

As a consequence, there is nothing inappropriate about the court's review of Nebraska's legislative declarations. Therefore, because the D & X procedure has been shown by medical evidence to be the safest procedure used by mainstream medical professionals like Dr. Carhart in certain circumstances, the court reiterates its view that Nebraska's wholesale ban of the procedure prior to viability is an "undue burden" under *Casey.*[37]

**(ii)**

The defendants argue that no undue burden is presented by the ban of the D & X procedure because other *equally* safe abortions procedures are still available. When the D & X procedure is used by Carhart, I find and conclude, as I have before, *Carhart I,* 972 F.Supp. at 529–30, that there are no *equally* safe alternatives.

First, the statistical evidence shows without a doubt that the D & E, and by inference its variant the D & X, is the safest of all

---

**35.** Unlike Dr. Stubblefield, a teacher and user of the D & E procedure, Dr. Boehm has not performed a standard D & E procedure for 10 to 15 years. He does not teach the procedure either. As a consequence, it is not surprising that Dr. Boehm did not appreciate advances in the D & E technique, such as the D & X procedure.

**36.** For example, Dr. Boehm, who generally supports abortion rights, testified that he opposed the "D & X" procedure for what appeared to be tactical reasons; that is, "such a procedure should be banned so as to comfort the general public in this country that abortions are not in the hands of callous extremists." (Ex. 27, Video-taped Dep. of Dr. Boehm, at 66:23–68; Ex. 25 at 2.) This case is not, however, about what is the best political tactic to advance a particular viewpoint.

**37.** It is worth noting again that the defendants do not argue that the "medical exception" provision of LB 23 would permit Carhart to perform the D & X procedure if necessary to preserve the life or health of the patient. *Carhart I,* 972 F.Supp. at 529. The medical exception would not apply to Carhart's patients because risks to maternal health are not considered and relative surgical risks are not considered either. *Id.*

other abortion procedures used during the gestational age during which Carhart performs the D & X. *Carhart I*, 972 F.Supp. at 525. For example, compared to induction abortions, the D & E is nearly twice as safe as the next safest procedure. *Id.* (citing AMA report, Ex. 7, at 10, tbl. 4 (between 13 and 21 weeks) (3.7 deaths per 100,000 for D & E's vs. 7.1 deaths per 100,000 for inductions)).[38]

Second, the medical evidence shows that when Carhart uses the D & X it is safer than the standard D & E. In the 10 to 20 times a year when Carhart can do his version of the D & X, rather than the D & E, Carhart: reduces operating time, blood loss and risk of infection; reduces complications from bony fragments; reduces instrument-inflicted damage to the uterus and cervix; prevents the most common causes of maternal mortality (DIC and amniotic fluid embolus); and eliminates the possibility of "horrible complications" arising from retained fetal parts. *Id.* at 525–27. These substantial safety enhancements arising from use of the D & X are particularly evident because Carhart takes the fetus as he finds it. His version of the D & X thus requires a minimum of instrumentation in the uterus and cervix compared with the standard D & E.

In summary, the evidence is both clear and convincing that Carhart's D & X procedure is superior to, and safer than, the D & E and other abortion procedures used during the relevant gestational period in 10 to 20 cases a year that present to Dr. Carhart.[39] Other judges have come to similar conclusions. *See, e.g., Richmond Medical Center for Women v. Gilmore*, 11 F.Supp.2d 795, 827 n.

40 (E.D. Va.1998) (stating the "record here contains significant evidence that the D & X procedure is often far safer than other D & E procedures."); *Hope Clinic v. Ryan*, 995 F.Supp. 847, 852 (N.D.Ill., 1998) (reciting advantages of D & X; stating, among other things, that "the intact D & E reduces the risk of retained tissue and reduces the risk of uterine perforation and cervical laceration because the procedure requires less instrumentation in the uterus."); *Evans*, 977 F.Supp. 1283, 1296 (six board certified doctors "all agree" that the D & X procedures "reduce risks associated with conventional D & Es"); *WMPC I*, 911 F.Supp. at 1070 (D & X procedure "appears to pose less risk to maternal health than any other alternative"). *See also* Ann MacLean Massie, *"Partial Birth Abortion" Bans*, 59 U. Pitt. L.Rev. at 371 (stating that "the medical evidence ... is inconclusive, [but] some relevant data suggest the possibility that D & X or intact D & E may actually represent an improvement over older late term techniques."; concluding that "the maternal health debate ... fails to provide the factual foundation necessary for restricting a woman's right of access to this particular abortion method, if she and her physician should determine that it is the best procedure for preserving her physical, emotional, and psychological health"). *But see Planned Parenthood of Wisconsin v. Doyle*, 9 F.Supp.2d 1033 (W.D.Wis.1998) (concluding on affidavits that "[i]ntact D & E's are no safer than conventional D & E's"; labeling the contrary finding in *Evans* as dicta; citing no cases in support of this finding) (preliminary injunction).[40]

**38.** I also note that even if the induction method were equally safe (and it is not) induction requires a patient to undergo labor in a hospital, with greater pain and economic cost, and induction procedures are not generally available to most women in Nebraska for elective abortions. As a consequence, the D & X ban would constitute an "undue burden" even if the induction procedure were as safe. *Id.* at 529 n. 37.

**39.** This is one reason why an "as applied" analysis, as opposed to a "facial" analysis, is preferable. In this case, rather than making generalizations about the relative safety of the D & X in all cases, the "as applied" analysis requires a focus on the particular procedures used by Dr. Carhart. Thus, the question is not whether the D &

X is "always" safer. Rather, the question is whether it is safer in the 10 to 20 cases a year when Dr. Carhart uses his variant of the procedure. However, I also note that the difficulty in evaluating the safety of any surgical technique in specific settings is one reason why many doctors justifiably worry that legislatures may make life threatening mistakes when drafting sweeping legislation designed to deal with specific surgical techniques.

**40.** Despite this ruling, on June 25, 1998, the Seventh Circuit, with Judge Manion dissenting, enjoined enforcement of the Wisconsin law pending oral argument. *Planned Parenthood of Wisconsin v. Doyle*, 9 F.Supp.2d 1033 (W.D Wis. 1998).

### (iii)

The defendants argue that even if the D & X procedure is safer, it is only marginally so. They argue that in order for a "burden" to be "undue" the burden must be "substantial"; in other words, the burden must present a "substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Casey*, 505 U.S. at 878, 112 S.Ct. 2791. They argue that Nebraska's law does not impose a "substantial obstacle." While I agree that the plaintiff must prove that the D & X ban poses a "substantial obstacle," I disagree with the factual premise of the defendants assertion; that is, the D & X ban is far from an insubstantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.

To promote nonviable fetal well-being, 10 to 20 women a year, who could not receive the best care possible from Dr. Carhart because of Nebraska's law, would be forced against their will to endure appreciably greater risks to their health and lives than are necessary. Among other things, they would suffer a larger than necessary risk of: (1) longer operating time; (2) greater blood loss and infection; (3) complications from bony fragments; (4) instrument-inflicted damage to the uterus and cervix, (5) exposure to the most common causes of maternal mortality (DIC and amniotic fluid embolus); (6) "horrible complications" arising from retained fetal parts. These are substantial obstacles within the meaning of *Casey*.

In summary, while it surely correct that the State of Nebraska has a profound interest in nonviable fetal life, it is beyond dispute that "a State may not prohibit *any woman* from making the ultimate decision to terminate her pregnancy before viability." *Casey*, 505 U.S. at 879, 112 S.Ct. 2791 (emphasis added). When a government compels 10 or 20 women to undergo a substantial risk of injury or death that could be avoided by the use of an accepted medical procedure in order to ensure the well-being of nonviable fetal life, an unconstitutional undue burden arises. The Supreme Court has made it plain that a government may not require a woman to sacrifice herself for a nonviable fetus and that is precisely what Nebraska's law requires.

### 2. Because the Law Prohibits Dr. Carhart from Vaginally Delivering a "Substantial Portion" of the Fetus for the Purpose of Performing an Abortion, the Law Imposes an "Undue Burden" on Dr. Carhart and his Patients; that is, Recognizing that the D & E is the Most Widely Used Procedure, Dr. Carhart Cannot Perform the D & E Procedure and Still Comply with the "Partially Delivers Vaginally" and "Substantial Portion" Language of the Law.

■ Nebraska's ban has constitutional ramifications far beyond the 10 to 20 women a year who would be denied the D & X procedure. The statute prohibits Dr. Carhart from using the standard D & E procedure. The ban therefore impacts every woman who seeks an abortion from Carhart between the 16th and 20th week; that is, the ban prohibits Carhart from employing the most widely used abortion technique for approximately 190 women each year. The ban therefore constitutes an undue burden.

### (a)

The ban prohibits Dr. Carhart from performing a "partial-birth" abortion. LB 23 § 3(1). Because the term "partial-birth" abortion is unknown in medical circles, *see, e.g.,* Ann MacLean Massie, *"Partial Birth Abortion" Bans,* 59 U. Pitt. L.Rev. at 313, the Nebraska legislature, following proposed federal legislation, was required to define terms. In doing so, the legislature informed Dr. Carhart, and those like him, that a "partial-birth abortion" means an abortion "procedure in which the person performing the abortion *partially delivers vaginally*" the fetus. LB 23 § 2(9). (Emphasis added). Because "partially delivers vaginally" was not clear, the legislature enacted another definition; that is, "partially delivers vaginally" means "deliberately and intentionally delivering into the vagina a living unborn child, *or a substantial portion thereof,* for the purpose of performing a procedure that the person performing such procedure knows will kill the unborn child and does kill the unborn child." *Id.* (Emphasis added.)

If the Nebraska legislature meant to ban only the D & X procedure, it did not accomplish its purpose. The words of the statute, fairly read, prohibit the D & E procedure. Doctors routinely "deliberately and intentionally" deliver "vaginally" a "substantial portion"[41] of a living fetus in order to kill it when performing a D & E.

For the sake of clarity, I have attached to this opinion Ex. 34. This is a medical drawing of the pelvic anatomy of a female. The drawing makes it clear that a surgeon cannot perform a standard D & E in the usual case without "partially vaginally delivering" a substantial portion of a fetus. During, and as a deliberate and intentional part of, this process, the surgeon "rupture[s] the waters" and "usually something prolapses through the . . . cervical os [and] very often an extremity will." (Tr. 109:6–8.) In the case of a leg, the leg is then protruding into the vaginal cavity.

To dismember the leg, the limb must be shorn from the body and this occurs at the junction of the vaginal cavity and the cervical os. If the leg is not pulled against the end of the cervix there is no resistance and the leg cannot be torn from the body. Accordingly, the doctor "pull[s] down on it through the os" and the leg is sheared from the body as a result of the resistance (traction) between the instrument and the cervix. (Tr. 109:16–19.)

The evidence makes clear that the dismemberment occurs outside of the uterus and at least partially in the vaginal cavity after the extremity has been partially pulled through the cervix:

Q When you are doing a D & E that involves dismemberment, where does the dismemberment occur; in other words, do you insert instruments into the uterus and dismember the fetus inside the uterus, or do you dismember it in some other way?

A Well, we insert one instrument inside the uterus, grab a portion of the fetus and pull it through the cervical os. The dismemberment occurs between the traction of . . . my instrument and the counter-traction of the internal os of the cervix. I suppose you could put two instruments in the uterus and try to dismember it. I think that would be very dangerous.

Q So the dismemberment occurs after you pulled a part of the fetus through the cervix, is that correct?

A Exactly.[42] Because you're using—The cervix has two strictures or two rings, the internal os and the external os, and you have—that's what's actually doing the dismembering. It's like who is pulling the cat's tail. If you are holding it and the cat's pulling it, something has to pull the other way. Otherwise, if you drag a string across the floor, you'll just keep dragging it. It's not until something grabs the other end that you are going to develop traction.

Q When we talked before or talked before about a D & E, that is not—where there is not intention to do it intact, do you, in that situation, dismember the fetus in utero first, then remove portions?

A I don't think so. . . . I don't know of any way that one could go in and intentionally dismember the fetus in the uterus. If you grab an extremity and twist it, you can watch the whole fetus just twist. It takes something that restricts the motion of the fetus against what you're doing before you're going to get dismemberment.

Q When you pull out a piece of the fetus, let's say, an arm or a leg and remove that, at the time just prior to removal of the portion of the fetus, is the fetus alive?

A Very often, yes, sir.

(Tr. 116:2–117:13.)

This evidence is entirely consistent with testimony in other cases. *See, e.g., Richmond Medical Center*, 11 F.Supp.2d at 805 (stating that "in performing a D & E, a physician

---

**41.** According to Dr. Stubblefield, these fetal parts routinely include legs or arms. (Tr.2d 31:16–17.)

**42.** Dr. Stubblefield, an acknowledged expert on the use of the D & E, confirmed that the dismem-

may intentionally 'deliver' a still-attached fetal limb into the vaginal canal before the limb is detached").

Dr. Stubblefield, an experienced practitioner and teacher of the D & E technique, testified that the effect of LB 23 was to ban D & E abortions. He stated that the "only way ... to avoid" delivering into the vagina a "living unborn child, or a substantial portion thereof," as stated in LB 23, is to either (1) perform a "significantly riskier" abdominal operation, such as hysterotomy or hysterectomy, so that "nothing is delivered into the vagina" or (2) cause fetal demise prior to beginning any abortion procedure in every case.[43] (Tr.2d 56:16–23; 57:3–8.) Dr. Stubblefield testified that the meaning of "deliberately and intentionally delivering into the vagina a living unborn child, or a substantial portion thereof" in LB 23 was "[s]ubject to opinion" because "[t]here is no legal or medical definition of what constitutes a substantial portion of an unborn child." (Tr.2d 55:23–56:5.) Dr. Stubblefield testified that if "substantial portion" meant "more than a little bit of the fetus," LB 23 "would be precluding most surgical abortions, making it illegal." (Tr.2d 62:5–12.)

In summary, when using the dismemberment D & E, the surgeon routinely dismembers a leg or arm from a nonviable, yet living, fetus. In any sensible and ordinary reading of the word, a leg or arm is "substantial." The physical act of dismemberment of this "substantial portion" of the intact fetus occurs partly in the vaginal cavity. The surgeon deliberately intends that all of these events occur in order to perform the D & E, a procedure the surgeon knows and deliberately intends will kill the nonviable living fetus.

Because Nebraska's law bans the D & E, the most widely used abortion procedure during the relevant gestational stage, an undue burden under *Casey* has been imposed upon Dr. Carhart and his patients who seek an abortion of a nonviable living fetus. The law is therefore unconstitutional. *See, e.g., WMPC II*, 130 F.3d at 200–01 (Judge Kennedy, speaking for the Sixth Circuit, said: "Because the definition of the banned procedure

includes the D & E procedure, the most common method of abortion[,]" the law "is an unconstitutional burden on a woman's right to choose to have an abortion.") (Ohio law provided that "No person shall perform a dilation and extraction procedure upon a pregnant woman" that involves the insertion of "a suction device into the skull of the fetus to remove the brain"); *Planned Parenthood of Greater Iowa v. Thomas Miller*, 1 F.Supp.2d 958, 963 (S.D.Iowa1998) (Iowa's "partial-birth abortion" law was so broad as to "encompass all pre-viability [abortion] procedures listed above [suction curettage and D & E] except for induction" and therefore the law likely violated *Casey*) (Iowa's law is nearly identical to Nebraska's; the law prohibits a doctor from "deliberately and intentionally delivering into the vagina a living fetus or substantial portion of a living fetus for the purpose of performing a procedure the person knows will kill the fetus, and then killing the fetus."); *Richmond Medical Center*, 11 F.Supp.2d at 825 (stating that the "D & E procedure likely is encompassed within the Act's ban"; finding an undue burden under *Casey* as a result) (Virginia's partial-birth abortion law is nearly identical to Nebraska's; under Virginia law a "partial-birth" abortion is defined as one "in which the person performing the abortion deliberately and intentionally delivers a living fetus or a substantial portion thereof into the vagina for the purpose of performing a procedure the person knows will kill the fetus, performs the procedure, kills the fetus and completes delivery."); *Hope Clinic*, 995 F.Supp. at 857 (finding "the statute, as written, has the potential effect of banning the most common and safest abortion procedures" which the court previously described as the D & E and the intact D & E or D & X; the statute was therefore an undue burden under *Casey*) (law prohibited "an abortion in which the person performing the abortion partially vaginally delivers a living fetus or infant before killing the fetus or infant and completing the delivery."); *Planned Parenthood of Southern*

---

berment did not occur in the uterus. (Tr.2d 30:23–25.)

**43.** As stated earlier, this alternative (causing fetal death by injection) has no maternal benefit, and

carries with it real maternal risk, during the gestational stage that Carhart performs D & E and D & X abortions.

*Arizona v. Woods,* 982 F.Supp. 1369, 1377–1379 (D.Ariz.1997) (noting that Arizona law could be construed to cover standard D & E procedures and that law could apply to "any part of alive intact fetus beyond the cervical os"; concluding that law was an unconstitutional burden under *Casey*) (Arizona law made it unlawful to "knowingly perform[ ] a partial birth abortion [that] kills a human fetus"); *Evans,* 977 F.Supp. at 1318 ("Michigan's 'partial-birth abortion' statute sweeps within its prohibition conventional D & Es" and "the law must be enjoined as unconstitutional under the undue burden analysis") (Michigan law used the phrase "partially vaginally delivers").[44]

### (b)

The defendants seek to avoid this ruling by trying to convince me that the law does not ban the D & E procedure. The defendants tacitly admit that if the statute banned the D & E procedure the law would be unconstitutional under current precedent. I am not persuaded by the defendants' arguments.

First, the defendants argue the Nebraska law is saved because the surgeon must "deliberately and intentionally" deliver into the vagina a substantial portion of the fetus for the purpose of performing a procedure that the person performing such procedure knows will kill the fetus and does kill the fetus. The defendants argue that unless the doctor deliberately intends to place a "substantial portion" of the fetus into the vagina for the purpose of performing the abortion the doctor has nothing to worry about.

The problem with the defendants' argument is that a surgeon performing a routine D & E deliberately intends to do exactly what the defendants admit is prohibited. In order to do a routine D & E, an intact limb usually enters the vaginal cavity after the "waters are ruptured," the surgeon deliberately intends for this to occur, and the surgeon deliberately intends to shear the "partially delivered" intact limb from the fetal body when that occurs. The dismemberment occurs, at least in significant part, in the vaginal cavity. As a result, the scienter provisions of the law do not serve to protect doctors who perform routine D & E procedures.[45] *See, e.g., Richmond Medical Center for Women,* 11 F.Supp.2d 795 (phrase "deliberately and intentionally" did not save Virginia's statute). Indeed, if the scienter provisions do anything, they serve to reinforce the broad criminal sweep of the law.

Second, the defendants argue that a surgeon need not worry because the Nebraska legislature did not intend to make criminal the D & E procedure. The problem, of course, with this argument is that the words of the statute, regardless of the legislature's intent, make the performance of the D & E a crime.

Moreover, a review of the legislative history refutes the assertion that the legislature did not intend to ban the D & E. If the legislative history reveals anything, it reveals that the legislature did not understand that the D & X (at least as performed by Carhart) varies in only small ways from the standard D & E technique. One simply cannot ascertain from the legislative history precisely

**44.** I do not decide if the law reaches the suction curettage method. The parties have focused upon the D & E and D & X procedures. In passing, Dr. Carhart testified that when performing the suction curettage method, he does not intend to remove the fetus or parts from the fetus by "delivering it partially into the vagina ... [b]ecause it goes through the tube through the vagina" outside the woman's body. (Tr. 156:7–16.) However, he also testified that he frequently is required to remove the tube to free it from obstructions and then the uterus expels the contents into the vaginal cavity. (Tr. 155:18–20.) Because the parties' evidence and written arguments only briefly touch on the question of whether the suction curettage method customarily results in "delivery[ ] into the vagina" within

the meaning of the statute, I decline to reach the question. Should Nebraska, contrary to its position in this case, move to enforce the law against doctors performing the suction curettage method, I would quickly issue injunctive relief until that issue could be addressed with more care. *See, e.g., Planned Parenthood of Greater Iowa,* 1 F.Supp.2d at 963 (Iowa's law apparently included suction curettage).

**45.** This understanding of the mechanics of the D & E procedure distinguishes *Planned Parenthood of Wisconsin v. Doyle,* 9 F.Supp.2d 1033 (holding that a similar scienter provisions saved Wisconsin law. In that case, perhaps because the decision was based on affidavits rather than on a compete trial record, the judge had a different

what the legislature wanted to ban. We know the legislators wanted to ban "partial-birth" abortions, but that term is unknown in medical circles and it was poorly understood, if at all, by the legislature.

For example, Senator Chambers tried to ascertain whether the ban only applied to the delivery of the whole fetal body, excepting the head, into the vaginal cavity. He was told that such was not the case. Senator Chambers was told that even the delivery of a foot into the vaginal cavity would trip the criminal penalties of the statute. The exchange between Senator Chambers and Senator Maurstad, the introducer of the bill, follows:

> Senator Chambers: Senator Maurstad, you and Senator Dierks have talked about how perfect this language is, and Senator Dierks can be at least considered a quasi-scientist.[46] I'd call him a scientist. Show me in this bill where it says that a partial-birth abortion means that all of the child has been delivered except for the head. I don't see that in the language.
>
> Senator Maurstad: The language on page 3, and it's cited again later, Senator Chambers, indicates that "partial birth means," and then it goes on, "perform the abortion partially delivers vaginally a living unborn child."
>
> Senator Chambers: Where does it say, as you ... are you willing to admit that the description you gave is not what's in the bill? You said, all is delivered except for the head. That's not in this bill, is it?
>
> Senator Maurstad: No, it says "partially delivered."
>
> Senator Chambers: And that could be a foot.
>
> Senator Maurstad: That could be a foot.
>
> (Ex. 30, Floor Debate on LB 23 (May 12, 1997) at 6412.)

The day before the bill passed, Senator Chambers asked Senator Maurstad what "substantial portion" meant. Senator Maurstad responded: "I think substantial would indicate that *more than a little bit* has been delivered into the vagina. *I don't mean to be flippant.*" (*Id.* at 9231–32.) (Emphasis added.) Senator Chambers asked "how much is a little bit." (*Id.*) Senator Maurstad responded, "Enough that would allow for the procedure to end up with the killing of the unborn child." (*Id.*)

In summary, unless it is rewritten, Nebraska's law bans the D & E procedure. It is not the job of this court to rewrite legislation, particularly where, as here, no one could accurately ascertain what the legislature intended to do. *See, e.g., Evans,* 977 F.Supp. at 1303. The legislature elected to use nonmedical terms to describe surgical techniques and it must bear the consequences of that decision. Accordingly, Nebraska's law is unconstitutional as it bans the D & E procedure, and it thus imposes an undue burden on women seeking abortions of nonviable fetuses.

**3. The Law is Void for Vagueness Because it Forces Dr. Carhart and His Patients to Guess About the Meaning of the Words "Substantial Portion."**

■ While vaginal delivery of an arm or leg is a "substantial portion" of a fetal body, it is unclear what more the term "substantial portion" may mean.[47] Every doctor who testified, including the defense experts, stated that they did not understand the outer limits of the term or the term could be interpreted in vastly different ways by fair-minded people.

For example, Dr. Riegel succinctly stated that "substantial portion" is a "vague term." (Tr. 315:7–25). Unlike Senator Maurstad, who thought a foot would trigger the ban, Dr. Boehm thought "substantial portion"

---

understanding of the mechanics of the standard D & E.

**46.** Senator Dierks is a veterinarian. Clerk of the Legislature, *Nebraska Blue Book* at 301 (1996–1997 ed.).

**47.** The plaintiff also argues that other portions of the law, like "delivers" and "living," are vague. I need not reach these claims since resolution of

the "substantial portion" issue, the one most hotly contested, ends the case. Moreover, these words take on particular meaning primarily when they are read with "substantial portion." Thus, it is difficult, if not impossible, to parse the meaning of these words when the term "substantial portion" is unconstitutionally vague. I note, however, that other courts have found these provisions unconstitutionally vague. *Richmond Medical Center,* 11 F.Supp.2d at 814–816; *Hope*

means "greater than half of the body." (Ex. 32, Dep. of Dr. Boehm, at 33:17–34:1.) Dr. Boehm was quick to admit, however, that his opinion "would by my own personal view and not necessarily the view of someone who wants to prosecute this letter of the law," *id.*, and that, of course, is precisely the point.

A criminal law, especially one banning protected constitutional freedoms like abortion, that fails to give fair warning or that allows arbitrary prosecution is "void for vagueness." *See, e.g., WMPC II*, 130 F.3d at 197. Nebraska's partial birth abortion ban is the epitome of such a law; that is, the words "substantial portion" are so vague as to be meaningless to doctors, lay people and prosecutors alike. *See, e.g., Planned Parenthood of Greater Iowa*, 1 F.Supp.2d 958, 961–963 (granting preliminary injunction and concluding that Iowa's law, which is very similar to Nebraska's law, was likely unconstitutionally vague); *Richmond Medical Center*, 11 F.Supp.2d at 816 (granting preliminary injunction because "there is certainly grave doubt that the term 'substantial portion thereof' supplies the kind of notice requirement to avoid a finding of vagueness or whether the term is sufficient to prevent arbitrary prosecution"); Ann MacLean Massie, *"Partial Birth Abortion" Bans*, 59 U. Pitt. L.Rev. at 339 (stating that "these bans are invariably unconstitutionally vague.").

### III. CONCLUSION

For three reasons, Nebraska's law banning so-called "partial-birth" abortions is unconstitutional as applied to Dr. Carhart. First, for 10 to 20 women a year the law endangers their health and lives in order to further the well-being of nonviable fetal life; that is, the law prohibits Dr. Carhart from using the safest procedure, which, for these women, is the D & X. Second, for about 190 women a year the law endangers their health and lives in order to further the well-being of nonviable fetal life; that is, the law prohibits Dr.

Carhart from using the safest procedure, which, for these women, is the D & E. Finally, the law is void for vagueness; that is, no one, including the defense experts, understand what the words "substantial portion" mean. Accordingly, I will give Dr. Carhart the permanent injunctive relief he seeks and I will declare Nebraska's law unconstitutional as applied to Dr. Carhart, his patients, and those like them.[48]

IT IS ORDERED that:

1. At the appropriate time, judgment shall be entered by separate document providing that:

> Judgment is entered for the plaintiff and against the defendants, jointly and severally. As applied to Dr. Carhart, his patients and others who are similarly situated, LB 23 (effective June 9, 1997) is declared unconstitutional regarding Carhart's method of performing D & E and D & X abortions on nonviable fetuses. The defendants, including their agents, servants and employees, are permanently enjoined from enforcing LB 23 against the plaintiff, his patients, and others who are similarly situated to the extent the law has been declared unconstitutional. The defendant Stenberg is ordered to serve a copy of the decision and judgment on all county attorneys in the State of Nebraska, and when so served such attorneys, and their agents, servants and employees, shall be permanently enjoined as well. *See* Fed.R.Civ.P. 65(d). Costs of this action, including reasonable attorney fees as may be awarded, are taxed to the defendants.

2. Judgment will be withheld pending resolution of the plaintiff's claim for attorney fees.

3. Plaintiff's application for attorney fees shall be submitted by July 20, 1998, and the defendants have until August 3, 1998 to respond. The parties are cautioned to comply with the Local Rules of Practice.

---

*Clinic,* 995 F.Supp. at 854. I would likely do so as well.

**48.** For the second time, I decline the defendants' invitation to establish a new category of constitu-

tional analysis for nonviable fetal life. *Carhart I,* 972 F.Supp. at 529. *Accord Richmond Medical Center,* 11 F.Supp.2d at 822 (stating that *"Carhart* is clearly right.")